

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-9-2001

# Skretvedt v. EI DuPont de Nemours

Precedential or Non-Precedential:

Docket 00-2918

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Skretvedt v. EI DuPont de Nemours" (2001). *2001 Decisions.* Paper 229.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/229

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 5, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2918

ORRIN T. SKRETVEDT, Appellant

v.

E.I. DUPONT DE NEMOURS AND COMPANY, a Delaware
Corporation; E.I. DUPONT DE NEMOURS AND COMPANY,
PLAN ADMINISTRATOR;* PENSION AND RETIREMENT
PLAN; HOSPITAL AND MEDICAL-SURGICAL PLAN;
DENTAL ASSISTANCE PLAN; NONCONTRIBUTORY
GROUP LIFE INSURANCE PLAN; CONTRIBUTORY GROUP
LIFE INSURANCE PLAN; TOTAL AND PERMANENT
DISABILITY INCOME PLAN; SAVINGS AND INVESTMENT
PLAN; TAX REFORM ACT STOCK OWNERSHIP PLAN;
SHORT TERM DISABILITY PLAN

*(Amended per Clerk's Order dated 12/13/00)

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 98-cv-00061)
U.S. Magistrate District Judge: Honorable Mary P. Thynge

Argued: June 28, 2001

Before: BECKER, Chief Judge, NYGAARD and
REAVLEY,* Circuit Judges.

(Filed October 5, 2001)

_____

* Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth
Circuit, sitting by designation.


        JOHN M. STULL, ESQUIRE
          (ARGUED)
        1300 North Market Street, Suite 700
        P.O. Box 1947
        Wilmington, DE 19899

        Counsel for Appellant

        RAYMOND M. RIPPLE, ESQUIRE
          (ARGUED)

DONNA L. GOODMAN, ESQUIRE
Legal D-7012
E.I. du Pont de Nemours and
 Company
1007 Market Street
Wilmington, DE 19898

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by Orrin T. Skretvedt, a former employee of defendant E.I. Du Pont de Nemours & Company ("DuPont"), from the order of the District Court granting summary judgment for DuPont on Skretvedt's suit alleging that DuPont had denied his claim for disability benefits under its pension and benefits plans in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. S 1001 et seq. For the reasons that follow, we will reverse.

The appeal first presents several questions about our scope of review, which we resolve in favor of applying the arbitrary and capricious standard prevalent in ERISA cases. We do not find the exceptions to that standard applicable here. Most significantly, we do not think the fact that DuPont's Associate Medical Director was involved in evaluating Skretvedt's claim both during the initial determination and on appeal creates a procedural impropriety that heightens the standard of review.

2

Despite the demanding arbitrary and capricious test, we conclude that the medical evidence of job-related stress that Skretvedt presented clearly demonstrates that he is eligible for disability benefits under Dupont's "Incapability Retirement" pension plan, one of the forms of disability benefits that he claims. Although we take the evidence in the light most favorable to DuPont, we are not convinced by DuPont's arguments that the medical evidence was inconclusive or equivocal with respect to the severity or permanence of Skretvedt's incapability to perform successfully the duties of his position. Indeed, Dupont can point to no truly conflicting medical evidence. Dupont's decision was "without reason," and it was "unsupported by substantial evidence." Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000) (quoting Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted)). It was therefore

arbitrary and capricious, requiring us to reverse the grant of summary judgment and to direct that summary judgment be entered on the Incapability Retirement claim in favor of Skretvedt.

I. Facts and Procedural History

Skretvedt worked as an environmental engineer for DuPont from June 28, 1974, until February 7, 1995, when he was discharged. At that time, Skretvedt held the position of Senior Research Environmental Engineer at DuPont's Spruance Plant in Richmond, Virginia. Among other things, he was responsible for ensuring that the plant complied with federal environmental regulations. Skretvedt's job responsibilities and the pressures associated with them increased significantly in 1994 when certain regulations under the Clean Air Act went into effect and the department where he worked was simultaneously downsized.

In early 1994, Skretvedt began receiving treatments for work-related anxiety from his family physician, Harold Binhammer, M.D., who periodically prescribed to him the anti-anxiety drug Lorazepam. Skretvedt took a leave of absence from his job at the Spruance Plant beginning on November 11, 1994, and did not return to work at Dupont

thereafter.1 In November 1994, Dr. Binhammer diagnosed Skretvedt with depression, prescribed the antidepressant Paxil and referred him to a psychiatrist, Graenum R. Schiff, M.D. Dr. Schiff saw Skretvedt periodically beginning in November 1994. Schiff put Skretvedt on a regular daily dose of twenty milligrams of Paxil and referred him for therapy with Teresa A. Buczek, Ph.D., a clinical psychologist who specializes in work-related stress disorders.

On December 5, 1994, James E. Layton, M.D., the Medical Supervisor at the Spruance Plant, wrote to Drs. Binhammer, Schiff and Buczek, requesting that they complete medical report forms to help him prepare a written opinion on whether Skretvedt's condition qualified him for disability benefits under DuPont's pension plan. All three doctors responded to Dr. Layton's request, giving their diagnoses and medical opinions of the severity and likely duration of Skretvedt's condition. We describe these opinions in greater detail below.

DuPont fired Skretvedt on February 7, 1995, citing the incident in which he was accused of taking home a

company fax machine without permission as the reason for the discharge. See supra note 1. Skretvedt filed a claim with the Equal Employment Opportunity Commission (EEOC), alleging that DuPont violated the Americans with Disabilties Act (ADA) by discriminating against him based on his anxiety disorder. The EEOC found no violation of the ADA based on the information that Skretvedt submitted, and issued him a right-to-sue letter. By September 1995, Skretvedt had contacted an attorney regarding his ADA and disability benefits claims. On September 29, Skretvedt, acting on the advice of counsel, signed a "Settlement

_____

1. Skretvedt was not officially terminated until February 7, 1995. The parties disagree about the reason that Skretvedt went on a leave of absence. Skretvedt contends that he was put on medical leave on the recommendation of his physician. DuPont counters that Skretvedt was asked to go on leave pending the outcome of an investigation into his taking home a fax machine from the office without permission (Skretvedt claims that he took it home for work-related use). As will appear, the alleged incident with the fax machine has little bearing on whether Skretvedt is eligible for disability benefits under DuPont's pension plan.

4

Agreement and Release of All Claims" with DuPont. Under this agreement, Skretvedt released all of his employment-related claims against DuPont except for his application for disability benefits, which DuPont agreed to review in a "neutral" manner.

DuPont's pension plan provides two different long-term disability benefits: (1) the "Incapability Retirement" pension ("incapability benefits"); and (2) the "Total and Permanent Disability Income Plan" ("T & P benefits"). An employee is eligible for incapability benefits if he is "permanently incapable of performing the duties of his position with the degree of efficiency required by the Company, and he has at least 15 years of service." Under its separate T & P benefits plan, DuPont provides additional benefits to individuals who are "disabled by injuries or disease and presumably will be totally and permanently prevented from pursuing any gainful occupation." At all times relevant to this litigation, it was the practice of DuPont's three-member Board of Benefits and Pensions ("Board"), which was responsible for administering both disability benefits plans, to first determine whether an employee qualified for incapability benefits.2 If so, the Board would determine whether the employee also qualified for T & P benefits.

Following the September 29, 1995 settlement agreement, the Board reviewed Skretvedt's claims for disability

benefits. The Board considered the medical evidence that DuPont's Dr. Layton had collected from Skretvedt's treating physicians and psychologist as well as a medical opinion from Dr. Layton himself, and determined that Skretvedt was not eligible for either type of long-term disability benefits. On May 23, 1996, the Board denied Skretvedt's application for both incapability and T & P benefits and issued a one-page form letter denying his benefits claims. The letter stated that Skretvedt had failed to show that he was "permanently incapable of performing the duties of [his] job with the degree of efficiency required by the

_____

2. In April 1997, DuPont outsourced the task of reviewing all employee benefits claims to an insurance company. However, Skretvedt's application, both before and after 1997, was processed using the internal review procedure that DuPont used before April 1997.

5

Company, at the time of [his] termination." It also advised him that in order to succeed on his appeal he would need to submit "additional objective evidence that will indicate a total impairment of function." The letter provided examples of such "objective evidence," including "tests such as MRI, x-ray reports and complete medical evaluations," but warned that "[o]pinions of healthcare providers are not sufficient without objective medical evidence to support such opinions."

Skretvedt contends that he and Dr. Binhammer sent three letters to the Board's designated contact for appeals, requesting clarification of the types of "objective medical evidence" needed to perfect his application on appeal in light of the fact that his claimed disability is psychological.3 After receiving no response for almost a year, Skretvedt formally submitted his appeal to the Board on May 16, 1997. He included with his application updated letters from the doctors who had examined him prior to his initial application, as well as letters and evaluation forms from other doctors. After hearing nothing from the Board for more than three more months, Skretvedt wrote to DuPont inquiring about the status of his appeal. He received no immediate response.

Having received no response from the Board, Skretvedt initiated the present lawsuit by filing a complaint on February 4, 1998, invoking 29 U.S.C. S 1132(a)(1)(B), which allows a beneficiary of an ERISA-governed benefits plan to sue for "benefits due to him under the terms of the plan." Skretvedt alleged that DuPont's pension and benefits review board had violated ERISA by arbitrarily and capriciously

denying him disability benefits, by acting in bad faith, and by operating under a conflict of interest. The parties entered into a stipulation agreeing to stay the proceedings until October 1, 1998, pending a final decision by the Board on Skretvedt's appeal for disability benefits. The parties also stipulated that the Board's decision on Skretvedt's appeal would "be the only decision for the purpose of judicial review of the denial of benefits."

_____

3. DuPont denies receiving these letters.

6

Following the October 1, 1998 stipulation, Skretvedt resubmitted the materials that he had included in his initial appeal application as well as additional materials. These included updated opinion letters from Drs. Binhammer and Schiff, and a psychological evaluation report and opinion letter from Richard B. Zonderman, Ph.D., a licensed clinical psychologist who had performed some standardized psychological tests on Skretvedt. All of these physicians and psychologists concluded that Skretvedt was unable to return to his previous job at DuPont. Skretvedt also submitted the "Explanation of Determination" that he received from the Social Security Administration following the denial of an application that he had filed for social security disability benefits. The explanation concluded that Skretvedt's "condition prevents [him] from doing the type of work that [he] has done in the past," but that he did not qualify for social security disability benefits because his disability "does not prevent [him] from doing less demanding work that does not require extensive public contact."

Skretvedt held two different jobs during the period following his termination from DuPont. In the spring of 1995, he established his own furniture repair and refinishing business. The business earned a modest profit in 1995, but lost money in 1996, and Skretvedt was forced to seek other employment. Beginning in May 1996, Skretvedt took a job with the Virginia Department of Labor as a compliance inspector. The position involved a two-year training period, during which his job responsibilities gradually increased. Skretvedt's work-related anxiety and depression increased in 1998 as his training period ended. As a result, Dr. Schiff recommended that Skretvedt take a two-month medical leave of absence beginning on August 17, 1998. Skretvedt has since resigned from his position at the Virginia Department of Labor.

The Board finally denied Skretvedt's appeal for disability

benefits on October 13, 1998. Following the Board's final decision, discovery in the present suit proceeded, after which the parties filed cross-motions for summary judgment. Acting pursuant to 28 U.S.C. S 636, a magistrate judge reviewed the motions and recommended that the

District Court grant DuPont's motion for summary judgment and deny Skretvedt's cross-motion. The District Court approved the report and issued the recommended orders. Skretvedt now appeals. The District Court had jurisdiction based on 28 U.S.C. S 1331 and 29 U.S.C. S 1132, and we have jurisdiction under 28 U.S.C. S 1291.

We exercise plenary review over a district court's grant of summary judgment. See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 441 n.3 (3d Cir. 2000). The familiar standards that we apply when reviewing motions for summary judgment are set forth in the margin.4

II. Standard of Judicial Review of the Board's Decision

Skretvedt argues that the District Court erred by reviewing the Board's denial of his disability benefits under the arbitrary and capricious standard, and that it should have applied a heightened standard of review due to the structural conflicts of interest and procedural irregularities in DuPont's pension benefits review system. In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court addressed the appropriate standard of review for courts to apply when reviewing an employer's denial of a benefit under an ERISA-governed plan. Drawing on principles of trust law, the Court held that where, as here, an employer's pension plan gives discretion to a plan administrator or fiduciary to interpret the plan and make benefits determinations, "a deferential standard of [judicial] review [is] appropriate." Id. at 111. When reviewing the denial of pension benefits under ERISA where the pension plan commits discretion to the fiduciary, we have employed, as Bruch directs, the "arbitrary and capricious" standard.

_____

4. Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

See, e.g., Keating v. Whitmore Mfg. Co., 186 F.3d 418, 420–21 (3d Cir. 1999). A court reviewing a benefits denial under the arbitrary and capricious standard must defer to the plan administrator unless the administrator's decision was "without reason, unsupported by substantial evidence, or erroneous as a matter of law." Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 393 (quoting Abnathya v. Hoffman–La Roche Inc., 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted)).

In Bruch, the Court also went on to state that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." 489 U.S. at 115 (quotation marks and citation omitted). Interpreting this language, we have held that even when a pension plan commits discretion to a fiduciary or plan administrator, a reviewing court should apply a heightened standard of review "either when the plan, by its very design, creates a special danger of a conflict of interest, or when the beneficiary can point to evidence of specific facts calling the impartiality of the administrator into question." Goldstein v. Johnson & Johnson, 251 F.3d 433, 442 (3d Cir. 2001) (citing Pinto, 214 F.3d at 383–87).

In Pinto, we specifically identified two conditions that indicate a special danger of a conflict of interest that would warrant applying a heightened standard of review. These are: (1) when a pension plan is unfunded, i.e., not "actuarially grounded, with the company making fixed contributions to the pension fund," 214 F.3d at 388, but rather funded by the employer on a claim–by–claim basis; and (2) when a plan is administered by an administrator outside of the employer company, such as an insurance company, that does not have strong incentives to keep employees satisfied by granting meritorious claims. Id. In circumstances that warrant a heightened level of review, we have held that a court should use a sliding–scale approach, examining each case on its facts to determine what level of review to apply; the greater the danger of a conflict of interest, the less deference the reviewing court should apply. Id.

The parties do not dispute that DuPont's pension plan

gives substantial discretion to the Board to interpret the terms of the plan and to administer benefits based on these interpretations. Usually, this would counsel a court to review the Board's decision under the arbitrary and capricious standard. Skretvedt argues, however, that Pinto requires us to apply a heightened standard in this case because: (1) the T & P benefits at issue in this case are part of an unfunded plan; and (2) there are procedural defects in DuPont's pension and benefits review system. 5

As noted above, the Board first considered Skretvedt's incapability claim, and finding that he did not qualify, denied his claims for both incapability benefits and for T & P benefits. DuPont does not make a regular actuarially determined contribution to a fund that supports the payment of benefits to employees who are totally and permanently disabled, hence the T & P benefits that Skretvedt applied for would be paid out of an unfunded plan. DuPont's incapability benefits, however, which Skretvedt also applied for, are part of a funded plan. As we explain in the margin, the mere fact that the T & P benefits plan is unfunded does not require applying a heightened standard of review to the denial of funded incapability benefits.6 However, a heightened standard of review might

_____

5. Skretvedt also argues that the Board showed a general partiality toward DuPont and a failure to appreciate its role as a fiduciary that would justify applying a heightened standard of review under Pinto. However, he does not document these contentions, and conclusory contentions do not constitute "evidence of specific facts calling the impartiality of the administrator into question." Goldstein, 251 F.3d at 442.
6. While it could conceivably be argued that the Board was biased in its evaluation of Skretvedt's incapability benefits claim because it was anticipating that a grant of incapability benefits would put it one step closer to granting benefits under the unfunded T & P plan, we think that this link to the source of the conflict (the unfunded plan) is too attenuated to "create[ ] a special danger of a conflict of interest." Goldstein, 251 F.3d at 442. As we observed in Pinto, all of the courts of appeals that have considered the judicial standard of review over denials of benefits governed by ERISA "appear to agree that some level of conflict may be unavoidable and not every conflict will heighten the level of scrutiny." 214 F.3d at 389. Here, the unfunded plan is at most indirectly connected to the incapability benefits determination; therefore any conflict that the T & P plan presents does not rise to the level at which Pinto counsels heightening the standard of review.

10

be applicable to the Board's denial of Skretvedt's claim for the unfunded T & P benefits, because of the potential

conflict under Pinto. Because we conclude that the Board's reason for denying incapability benefits was arbitrary and capricious, see infra Part III.B.4, and because the Board relied on the same reason to deny T & P benefits, that denial was also arbitrary and capricious. We therefore need not decide whether a stricter standard of review is applicable to the Board's denial of Skretvedt's claim for T & P benefits.

Skretvedt also contends that there are defects in the structure and procedure of DuPont's pension and benefits review system that require us to apply a heightened level of review. These arguments focus mainly on the role that Dr. Benjamin Ramirez, Dupont's Associate Medical Director, played in the Board's review of claims for disability benefits. While he was not a member of the Board, Ramirez was involved in evaluating applications for disability benefits at both the initial stage and at the appeal level. During the period relevant to this case, the initial determination to deny an application for disability benefits was not made by the three-member Board, but rather by two board "delegates": Dr. Ramirez, and Herbert Watson, a DuPont benefits administrator. If the delegates decided that the employee did not qualify for the benefits that he claimed, the employee was notified of the decision and informed that he could appeal. At the appeal level, the three-member Board (which did not include Ramirez or Watson), would vote on whether to change the initial determination, relying in part on Dr. Ramirez's recommendation, which he based on his review of all of the medical evidence presented.

Skretvedt argues that two features of Dr. Ramirez's participation in the evaluation process call into question the Board's impartiality in a way that counsels increasing the standard of review above arbitrary and capricious.

First, Skretvedt submits that it was improper for Dr. Ramirez to be involved in the evaluation process during both the initial benefits determination and the appeal. In Skretvedt's view, Dr. Ramirez could not impartially advise the Board regarding appeals from benefits denials if he made the initial determination. But under the ERISA

regulations in effect during the times relevant to this case, there was no requirement that the appellate decisionmaker even be someone different from the initial decisionmaker. See Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan, 797 F.2d 521, 534 (7th Cir. 1986); 29 C.F.R. S 2560.503-1(g)(1) & (2) (2000). Therefore, Ramirez's roles as a decisionmaker in the initial proceeding and as an

advisor in the appellate proceeding are not evidence of a conflict of interest that would require heightened review.[7]

Second, Skretvedt contends that, as DuPont's Associate Medical Director, Dr. Ramirez necessarily acted as an "advocate" for DuPont, and sought to convince the Board to deny Skretvedt's claim on appeal. Skretvedt submits that because DuPont had an advocate present at the Board meetings, he also should have been permitted to have a representative present.

In Grossmuller v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, 715 F.2d 853 (3d Cir. 1983), we held that in order to give an ERISA-governed benefits claim "full and fair review" as is required by ERISA S 503, 29 U.S.C. S 1133, a decisionmaker must allow a claimant to make his case in person (or through a representative) if the decisionmaker receives testimony from a third party in opposition to granting the claim. See id. at 858. Subsequent cases have made it clear, however, that Grosmuller extends only to "the situation wherein a third party is permitted to appear at a meeting and provide factual information which the absent claimant cannot refute." Hlinka v. Bethlehem Steel Corp.,

_____

7. Dr. Ramirez's role as the initial decisionmaker and as an advisor on the appeal level would be permitted even under the new and more detailed regulations governing appeals from ERISA benefits determinations, which will apply to claims filed on or after January 1, 2002. See 66 Fed. Reg. 35886 (July 9, 2001). The new regulations require only that appellate review of a benefits claim be conducted by "an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." 29 C.F.R. S 2560.503-1(h)(3)(ii) (2001). Here, Ramirez was not a member of the Board that acted as the fiduciary decisionmaker in Skretvedt's appeal, nor is there any evidence that the members of the Board were his subordinates.

12

863 F.2d 279, 287 (3d Cir. 1988). In this case, there is no evidence that Dr. Ramirez presented any factual testimony that Skretvedt did not have a chance to review. Ramirez gave an opinion based on his review of the medical reports from Skretvedt's own doctors and from Dupont's Dr. Layton, all of which Skretvedt had seen. Nor is Ramirez a "third party" as contemplated by Grossmuller.

In short, there is no reason to doubt the Board's contention that Dr. Ramirez was acting merely as an advisor to the Board rather than as an advocate for

DuPont. Therefore, the District Court was correct to apply an arbitrary and capricious standard when reviewing the Board's denial of Skretvedt's claim for incapability benefits. We decline to reach the question whether a stricter standard of review is applicable to the Board's denial of Skretvedt's claim for T & P benefits.

III. The Board's Decision to Deny Skretvedt's Claim for Incapability Benefits

A. Introduction

The language from DuPont's benefits plan that governs a claimant's eligibility for incapability benefits is as follows:

> An employee may be retired by the Company if the Board of Benefits and Pensions finds that he has become, for any reason, permanently incapable of performing the duties of his position with the degree of efficiency required by the Company, and he has at least 15 years of service.

DuPont's Board interprets this language to require that the claimant show that his or her incapability was permanent at the time of his or her termination. DuPont presented the following interpretation to the District Court:"[T]o receive an award of benefits: (1) the applicant must present evidence that he was permanently (as opposed to temporarily) disabled; (2) at the time of the termination; and (3) the severity of the disability at termination permanently precluded the applicant from performing the duties of his position." Mem. Op., Sept. 6, 2000, at 5 n.6. The Board's

13

interpretation of DuPont's pension and benefits plan is entitled to deference under the arbitrary and capricious standard, unless it is contrary to the plain language of the plan. See Epright v. Envt'l Res. Mgmt., 81 F.3d 335, 339 (3d Cir. 1996). Because DuPont's interpretation is consistent with the plan's language, we apply it here when reviewing the Board's denial of Skretvedt's claim for incapability benefits.

The reasons that DuPont now offers for denying Skretvedt's disability claims are that the medical evidence that he presented was not sufficient to show that his disability was permanent at the time of his termination, and that the evidence was not sufficient to show that his disability was severe enough to prevent him from performing his previous job at DuPont. We find these justifications to be post hoc because they were never offered

to Skretvedt following the denial of his initial claim or his appeal.8

_____

8. The original denial letter sent to Skretvedt merely restated the requirements of the benefits plan, concluding that Skretvedt had failed to show that he was "permanently incapable of performing the duties of [his] job with the degree of efficiency required by the Company, at the time of . . . termination," without providing any explanation of why the Board reached that conclusion. Dr. Ramirez admitted in deposition that the instruction that Skretvedt received in his initial denial letter regarding what additional information he needed to provide on appeal in order to succeed was a "boilerplate statement." Similarly, the letter that the Board sent Skretvedt denying his appeal, while it listed the evidence that the Board had before it, did not provide any specific reasons for denying the appeal. The Board's failure to provide Skretvedt with reasoned explanations for why it denied his disability claims or information on what evidence he could present to improve his claims raises policy concerns that underlie the notice requirements that ERISA places on pension and benefit review boards. Specifically, the review boards must give reasons to applicants for denying their claims so that: (1) applicants may clarify their application on appeal; and (2) federal courts may exercise an informed and meaningful review of the pension boards' decisions.

Skretvedt argues that both the Board's initial letter denying his claims and the letter denying his appeal provided insufficient notice of the reasons for denial to satisfy the requirements of ERISA S 503, 29 U.S.C.

14

However, we will assume arguendo that it is proper for us to consider these post hoc justifications. For the reasons

_____

S 1133. Section 503 requires that employee benefit plans "provide adequate notice in writing" of a claim denial"setting forth the specific reasons for such denial." 29 U.S.C. S 1133(1); see also 29 C.F.R. S 2560.503-1(g) (2001). Skretvedt contends that the letters violated S 503 by failing to provide reasons for the denial and by failing to provide an explanation of what would constitute sufficient"objective" medical evidence of a psychological disability. One of the main purposes for the requirement that the denial letter provide specific reasons "is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." DuMond v. Centex Corp., 172 F.3d 618, 622 (8th Cir. 1999).

We find the lack of explanations in the denial letters that DuPont sent Skretvedt troubling. We do not reach the question whether the notice was legally inadequate under S 503, however, because we resolve this appeal on the ground that, even fully crediting the post hoc rationales offered by Dupont, the Board's decision to deny benefits was arbitrary

and capricious. For the same reason, we decline to reach the question of what level of deference is owed to rationales for denying benefits under an ERISA-governed plan that a pension board presents for the first time in federal court. We take this opportunity, however, to underscore the importance of pension boards providing specific reasons for denying applicants' benefits claims, both so that applicants may introduce the proper evidence on appeal and so that a federal court may exercise meaningful review.

We note in this regard our agreement with the policy concerns identified in University Hospitals of Cleveland v. Emerson Electric Co., 202 F.3d 839 (6th Cir. 2000), where the court held that it would not defer to post hoc rationales for denying benefits claims generated for the purpose of litigation by ERISA plan administrators when those rationales did not appear in the denial letters sent to the benefits claimants or in the administrative record. The court observed that:

> it strikes us as problematic to, on one hand, recognize an
> administrator's discretion to interpret a plan by applying a
> deferential "arbitrary and capricious" standard of review, yet, on the
> other hand, allow the administrator to "shore up" a decision after-
> the-fact by testifying as to the "true" basis for the decision after the
> matter is in litigation, possible deficiencies in the decision are
> identified, and an attorney is consulted to defend the decision by
> developing creative post hoc arguments that can survive deferential
> review. . . . To depart from the administrative record in this fashion

that follow we nonetheless conclude that the Board's proffered justifications are unconvincing in light of its own interpretation of the eligibility requirements for incapability benefits and the medical evidence before it.

B. The Medical Evidence Presented

Skretvedt submitted two sets of medical evidence to the Board, one set with his initial application, and another set with his appeal. Together, these two sets of medical opinions make up the entirety of the medical evidence that the Board had before it when it made its decision to deny Skretvedt's benefits. Our disposition of the case turns on whether this evidence is sufficient to demonstrate that Skretvedt was permanently disabled at the time of his termination and that his disability was (and continues to be) severe enough to prevent him from "performing the duties of his position with the degree of efficiency required" by DuPont.

1. Items Submitted in Skretvedt's Initial Application

The items that Skretvedt submitted with his initial application included several letters from his treating physicians, Dr. Graenum Schiff and Dr. Harold Binhammer, a letter from his treating clinical psychologist, Dr. Theresa Buczek, and an evaluation form that Dr. James Layton, the Spruance Plant's Medical Director, completed in October 1995.

Skretvedt submitted an evaluation report from Dr. Schiff dated November 16, 1994, which diagnosed him with an "[a]djustment Disorder with anxious mood" and stated that he suffered from "severe work stress." At the bottom there were handwritten notes explaining that, since he had been

_____

would, in our view, invite more terse and conclusory decisions from plan administrators, leaving room for them -- or, worse yet, federal judges -- to brainstorm and invent various proposed "rational bases" when their decisions are challenged in ensuing litigation.

Id. at 848 n.7.

16

taking the antidepressant drug Paxil, Skretvedt was "much improved." On January 17, 1995, however, Dr. Schiff wrote to Dr. Layton that although the antidepressant drug Paxil was helping, Skretvedt "is no longer temperamentally suited to do the job he was doing at his previous level of efficiency . . . and for this reason I would recommend early retirement."

In a letter dated January 26, 1995, Dr. Binhammer, Skretvedt's family physician, explained that in November 1994, Skretvedt was in an "acute" state of depressive anxiety, which was ameliorated with medication and with his leave from work. Binhammer concluded that "Skretvedt should not go back to his position as an Environmental Engineer . . . because of the anxiety precipatated[sic] to him by this type of work and then the resultant breakdown in his psyche. At this time while not clearly definable as to the length of time, I suspect it may be permanent."

Dr. Buczek, a clinical psychologist who treated Skretvedt, wrote two letters to the Board regarding his condition. The first, dated January 16, 1995, stated that Skretvedt was suffering from emotional problems due to job pressure, and that "[i]n regard to the question of whether these impairments are temporary . . . I am still unclear. I

recommend that he be considered unfit for work activity for the next 90 days. During that time in therapy, we can better determine if he will be able to work at some other job in DuPont. I do not believe that he will be able to return to his former position, and that this is a very unlikely possibility for now or the future." Dr. Buczek's second letter, dated January 23, 1995, described Skretvedt's symptoms in greater detail, but did not mention his fitness for work or the permanence of his condition.

Finally, Skretvedt submitted an evaluation that Dr. Layton completed in October 1995. The evaluation diagnosed Skretvedt with an "Adjustment Disorder with Mixed Emotional Features," and stated "Prognosis: guarded, to be able to return to present job assignment . . . because of his inability to concentrate and think coherently because of stress." On the basis of the foregoing evidence, the Board denied his benefits claims, stating that "the medical evidence submitted does not support a conclusion that you

17

are permanently incapable of performing the duties of an Environmental Engineer with the degree of efficiency required by the Company. . . . In order for your appeal to be successful, you must provide additional objective evidence . . . ."

2. New Documents Submitted on Skretvedt's Appeal

Skretvedt relates that, at this point, he and Dr. Binhammer sent a total of three letters requesting clarification as to what kind of evidence they should submit on appeal. DuPont denies receiving the letters. After he did not hear anything further from DuPont, Skretvedt attempted to get a complete set of psychological tests performed. He then submitted several new sources of medical evidence in his appeal application (in addition to resubmitting the documents that he had included in his initial application).9

The new documents that Skretvedt submitted with his appeal application included: two letters from Dr. Richard B. Zonderman, a clinical psychologist who in March 1997 performed a clinical interview and two types of standard psychological tests for Skretvedt; updated letters from Drs. Schiff and Binhammer; and a letter from the Social Security Administration denying Skretvedt's claim for disability insurance benefits.

The first Zonderman letter describes the clinical interview and two standardized psychological tests: MMPI-2

(Minnesota Multiphasic Personality Inventory), and MCMI–III (Millon Clinical Multiaxial Inventory). Based on his examination of Skretvedt, Zonderman concluded that Skretvedt was at that time experiencing many of the same

_____

9. It is unclear whether the magistrate judge, when reviewing DuPont's motion for summary judgment, considered the medical evidence that Skretvedt submitted to the Board with his appeal application. The magistrate judge's September 6, 2000 memorandum opinion cites and discusses only the medical evidence that Skretvedt submitted in his initial claim for disability benefits. However, it is proper for us to consider all of the medical evidence that Skretvedt submitted since DuPont represents that its Board considered all of the medical evidence when it denied Skretvedt's appeal.

18

symptoms that he had complained of in 1994 and 1995, and was suffering from a "prominent anxiety disorder." Zonderman went on to conclude that "[w]hat began as a work related situation has spread and now affects all aspects of [Skretvedt's] life" and that"[r]eturn to a job resembling the environmental engineering position which caused [Skretvedt's] problems would most likely precipitate post traumatic stress like symptoms." Zonderman also stated that "[w]hatever the etiology, . . . underlying personality features will make change difficult and protracted." In his second letter, dated July 29, 1998, Zonderman opined that Skretvedt's emotional problems had been caused by his job, that some of the symptoms had been treated by doctors before Skretvedt left his employment with DuPont, that Skretvedt was still in therapy in July 1998 with two different doctors, and that "[h]e cannot return to a similar work environment . . . ."

The first letter from Dr. Schiff, dated May 9, 1997, explained that he was writing to supply the evidence required by the Board regarding the permanence of Skretvedt's condition. The letter noted that Drs. Schiff, Buczek, and Binhammer had all examined Skretvedt before his termination and concurred that Skretvedt would never be able to return to his position at DuPont. The letter questioned the Board's requirement of "objective" evidence, such as X-rays and MRIs, representing that such evidence is impossible to obtain for psychiatric disabilities. Schiff concluded by citing two pieces of "objective proof " of the permanence of Skretvedt's psychiatric disabilities. First, he related that when Skretvedt attempted to return to a job in his old field of industrial hygiene (i.e., his job as a compliance inspector at the Virginia Department of Labor) "his symptoms returned and his condition deteriorated."

Second, he pointed out that several specialists had examined Skretvedt and had all agreed that his condition is permanent.

Dr. Schiff 's second letter, dated July 28, 1998, updated the previous letter, stating that Skretvedt's anxiety disorder had intensified as the two-year training program for his entry-level industrial hygiene position was drawing to a close, and that as a result, his medication had to be

19

increased. Dr. Schiff concluded that Skretvedt should not be working at all. Moreover, on August 17, 1998, soon after writing his second letter, Dr. Schiff recommended that Skretvedt go on a two-month medical leave of absence.

An updated letter from Dr. Binhammer, dated May 9, 1997, stated that, as of that date, Skretvedt would respond to stress with "post traumatic episodes," and that these symptoms were the same as those "Skretvedt was experiencing back in 1994." The letter noted that during the time that Skretvedt worked as a furniture refinisher, these episodes were less frequent because of the change of job environment, but that when Skretvedt attempted to return to his old field, the symptoms returned and "escalated." The letter concluded: "My prognosis today is the same as in 1995, with firmer conviction. More than two years have passed and the problems . . . have continued. . . . I think time and circumstance have proven our original prognosis for Mr. Skretvedt. I continue to believe his condition is total and permanent."

Finally, Skretvedt submitted the letter from the Social Security Administration denying his claim for disability insurance benefits. As discussed above, the SSA concluded that Skretvedt was permanently unable to perform his previous job at DuPont, but was ineligible for disability insurance benefits because he was still able to perform other work.

3. DuPont's Contentions Evaluated

DuPont contends that Skretvedt's medical evidence was inconclusive with respect to showing (1) that his disability was severe enough to render him incapable of performing his former job at DuPont; and (2) that Skretvedt's disability was permanent as of the time of his termination. The District Court agreed. However, we find neither of these arguments convincing in the face of the persuasive and essentially unrebutted medical evidence that Skretvedt presented to the Board.

DuPont challenges several of the pieces of medical
evidence that Skretvedt submitted, arguing that internal
contradictions or insufficiency in certain pieces of medical

evidence demonstrate that the medical documents are as a
whole equivocal or inconclusive with respect to either the
severity or the permanence of Skretvedt's disability, or
both. We take these up seriatim.

a. Documents Submitted with the Initial Application

DuPont first challenges two evaluations that diagnosed
Skretvedt with an "Adjustment Disorder," one from Dr.
Schiff in 1994 and one from Dr. Buczek in 1995. According
to the fourth edition of the Diagnostic and Statistical
Manual of Mental Disorders (DSM-IV), cited by DuPont,
adjustment disorders are generally triggered by a stressor,
"and last[ ] no longer than 6 months after the stressor or its
consequences have ceased." DSM-IV 625 (4th ed. 1994).
DuPont argues that this treatise demonstrates that the
psychiatric disorder that Drs. Schiff and Buczek diagnosed
is not permanent. This argument overlooks the fact,
however, that the DSM also states that "[i]f the stressor or
its consequences persist, the Adjustment Disorder may also
persist." Id. Drs. Schiff and Buczek made it clear in the
documents in which they diagnosed Skretvedt with an
adjustment disorder that the stressor that triggered the
adjustment disorder was Skretvedt's job at DuPont.

More particularly, the narrative section of Dr. Schiff 's
1994 medical evaluation form focused on Skretvedt's
complaints about the stresses of his job at DuPont.
Furthermore, Dr. Buczek's January 16, 1995 letter
concluded that "[t]his diagnosis and these symptoms
appear to be related to increased job pressures and
responsibilities." The relevant question with respect to
Skretvedt's eligibility for incapability benefits is whether his
disability renders him permanently incapable of doing his
previous job. Therefore, the DSM's statement that an
adjustment disorder will usually last no longer than six
months after the removal of the triggering stressor does not
diminish the force of the diagnosis when the stressor that
the diagnosing doctors identified is Skretvedt's previous job.

DuPont next submits that notes from Dr. Schiff and a
medical report from Dr. Binhammer show that Skretvedt's
medical condition improved quickly once he started

treatment with the antidepressant drug Paxil, and that therefore the condition is not permanent. Handwritten notes at the end of Dr. Schiff 's November 16, 1994 medical report indicate that Skretvedt was "much improved on Paxil." A January 26, 1995 letter from Dr. Binhammer also notes that Skretvedt's "Depressive Medical illness [had] improved." But the fact that Dr. Schiff 's notes and Dr. Binhammer's letter indicate that Skretvedt's depression improved with medication does not mean that his condition no longer rose to the level of severity that would prevent him from doing his previous job at the required degree of efficiency.

Reading these statements in the context of the totality of the reports and letters in which they appear, it is clear that Drs. Schiff and Binhammer meant that Skretvedt's condition had improved, not that it had improved to a point where he was capable of performing his previous job at DuPont. For example, in the same letter in which Binhammer wrote that medication and therapy had improved Skretvedt's depression, he also wrote that "Mr. Skretvedt should not go back to his position as an Environmental Engineer . . . because of the anxiety precipatated [sic] to him by this type of work and then the resultant breakdown in his psyche."

DuPont also points to the statements that Dr. Buczek made about the permanence of Skretvedt's condition in the materials that Skretvedt submitted with his initial application for disability benefits. Specifically, DuPont cites a recommendation that Buczek made in her January 16, 1995 letter -- that Skretvedt should be "considered unfit for work activity for the next 90 days" and that he should be reevaluated at that time. However, the next sentence in Buczek's letter makes it clear that while she held out hopes that Skretvedt might at that time "be able to work at some other job at Dupont," she did "not believe that he w[ould] be able to return to his former position."

b. The Period from 1995 to 1997

DuPont submits that two different aspects of the evidence presented regarding Skretvedt's condition during the period

22

from 1995 to 1997 show that the evidence is equivocal and that therefore the Board's denial of disability benefits was reasonable.

DuPont first contends that Skretvedt's failure to present evidence that he received treatment from February 1995 through March 1997 shows that his condition was either insufficiently severe or that it was temporary. But Skretvedt's failure to present evidence that he was treated during this period does not mean, as DuPont suggests, that treatments were suspended because the disability no longer existed. Such an inference is unreasonable in light of the statement of Dr. Layton, the Spruance Plant's Medical Director, that as of October 1995, Skretvedt told him that he had stopped receiving treatment from Drs. Schiff and Buczek because of the expense. Skretvedt's attorney confirmed at argument that Skretvedt had no health insurance during much of the period from 1995 to 1997 and was unable to pay for treatments.

DuPont next argues that the fact that Skretvedt held a job at the Virginia Department of Labor during the period from 1995 to 1997 that was generally in the same field as his job at DuPont shows either that his condition was not so severe that it would have prevented him from doing his old job at DuPont, or that the condition was not permanent, i.e., it had improved enough for him to take a position similar to the one he held at DuPont. The circumstances surrounding Skretvedt's job at the Virginia Department of Labor, however, demonstrate otherwise.

Motivated by financial necessity, Skretvedt abandoned his furniture refinishing business, and took what was, according to a letter from Dr. Binhammer, an entry-level position as a compliance inspector with the Virginia Department of Labor. Both Drs. Schiff and Binhammer opined that Skretvedt's job as a compliance inspector had made his psychological condition as bad or worse than it was during the last year of his employment at DuPont. Dr. Schiff wrote that "[a]s the end of [the] training approached . . . and full responsibilities were assumed, he experienced a serious escalation in symptoms." Similarly, describing Skretvedt's job at the Department of Labor, Dr. Binhammer concluded that when Skretvedt returned to "even a similar

23

work situation [to his job at Dupont,] the condition returned with even more severity." Given these descriptions of the return of Skretvedt's symptoms, the fact that Skretvedt worked for a time in an entry-level position at the Virginia Department of Labor that was generally in the same field as his previous job at DuPont does not rebut or render inconclusive the medical evidence of his permanent inability to do his previous job at DuPont.

c. Documents Submitted to the Board for the First
Time in the Appeal Application

DuPont argues that the 1997 report from Dr. Zonderman
contains only "general, conclusory" statements, and could
be interpreted as stating only that current stressors in
Skretvedt's life in 1997 were causing his illness. In
addition, DuPont contends that Dr. Zonderman's diagnosis
that Skretvedt suffered from an Axis I disorder of"Major
Depression, single episode, moderate chronic," indicates
that the condition is not permanent. Zonderman's report,
however, also diagnosed Skretvedt with a psychological
syndrome that it described as a "longstanding behavioral
pattern," and recommended that Skretvedt receive
immediate treatment with both drugs and psychotherapy.
In a follow-up letter dated July 29, 1998, Zonderman
indicated that he had been treating Skretvedt since his
initial evaluation, and that he continued to show symptoms
of post-traumatic stress disorder.

Dupont also challenges the sufficiency of Schiff 's and
Zonderman's follow-up letters from 1997 and 1998,
asserting that they are conclusory and that they do not
provide conclusions as to whether Skretvedt's condition is
treatable or permanent, or whether it existed at the time of
his termination. We are unpersuaded. These brief letters
were merely introduced to update letters written earlier,
which do state case dispositive conclusions. Dr. Schiff 's
earlier letter specified his opinion that Skretvedt's condition
was permanent. Dr. Zonderman, in his 1998 letter,
specifically stated that all of the problems began during
Skretvedt's DuPont employment.

24

4. Summary--Applying DuPont's Standard for
Eligibility to the Medical Evidence

The question that the Board faced when reviewing
Skretvedt's appeal application was whether in light of all
the medical evidence presented, he demonstrated that he
was "permanently . . . disabled; at the time of the
termination; and [that] the severity  of the disability at
termination permanently precluded [him] . . . from
performing the duties of his position." Mem. Op., Sept. 6,
2000, at 5 n.6. The dispositive question is whether,
applying the Board's interpretation of Dupont's benefits
plan and taking the evidence in the light most favorable to
DuPont, the Board's denial of Skretvedt's claim for
incapability benefits was arbitrary or capricious, i.e.,
whether it was "without reason [or] unsupported by

substantial evidence." Pinto, 214 F.3d at 393 (quoting Abnathya v. Hoffman-La Roche Inc., 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted)).

In light of the foregoing medical evidence, we conclude that even under the deferential arbitrary and capricious standard, DuPont's denial of Skretvedt's incapability benefits claim must be rejected because it was unsupported by substantial evidence. The medical evidence provides clear support for all three of the elements of the eligibility requirements for incapability benefits as DuPont defines them. It shows that Skretvedt had a psychological disability that: (1) is severe enough to prevent him from performing his previous job at the required level of efficiency; (2) is permanent; and (3) existed as of the date of his termination. Indeed, the medical experts who examined Skretvedt concluded unanimously that his psychological condition was severe enough to prevent him from "performing the duties of his position with the degree of efficiency required" by DuPont. While in 1994 and 1995 some of the doctors expressed uncertainty about the duration for which Skretvedt would be required to forego all work, all concluded that he could not return to his old job.

Moreover, the follow-up statements of Skretvedt's examining physicians and the supplemental medical report and letter from Dr. Zonderman confirm their initial opinions that Skretvedt's psychological disability is

25

permanent. In these documents, all of the doctors who submitted evaluations for Skretvedt's initial application reaffirmed their conclusion that he is not capable of performing his old job at DuPont, lending support to their previous conclusions that the condition is permanent. Dr. Zonderman's evaluation reached the same conclusion, and linked Skretvedt's psychological condition to the stresses that he faced at work at DuPont.

The letters from Drs. Schiff, Binhammer, and Buczek also establish that Skretvedt's condition existed before his termination from DuPont in February 1995. All three of these doctors examined Skretvedt and diagnosed his disorder before he was fired. We find it relevant that Drs. Binhammer and Schiff had long-term treatment relationships with Skretvedt and that therefore they were uniquely able to provide detailed longitudinal information on Skretvedt's condition. We have long recognized that in the analogous area of disability benefits determinations under the Social Security Act, the "opinions of a claimant's treating physician[s] are entitled to substantial and at times

even controlling weight." Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001); see also Cotter v. Harris , 642 F.2d 700, 704 (3d Cir. 1981).

For the reasons stated above, although we take the evidence in the light most favorable to DuPont, we are not convinced by DuPont's arguments that the medical evidence was inconclusive or equivocal with respect to the severity or permanence of Skretvedt's disability. Because the medical evidence that Skretvedt presented makes it clear that he meets the eligibility standards for incapability benefits, and the Board can point to no conflicting medical evidence, we find that the Board's decision was arbitrary and capricious because it was "without reason" and it was "unsupported by substantial evidence." Pinto, 214 F.3d at 393 (quoting Abnathya v. Hoffman-La Roche Inc. , 2 F.3d 40, 45 (3d Cir. 1993) (internal quotation marks omitted)). The order of the District Court granting summary judgment in favor of DuPont and denying summary judgment in favor of Skretvedt on the claim for incapability benefits will therefore be reversed, and the case remanded to the District Court with directions to grant summary judgment

in favor of Skretvedt on the claim for incapability benefits. See, e.g., Canseco v. Constr. Laborers Pension Trust, 93 F.3d 600, 609 (9th Cir. 1996) (no remand is necessary where no new factual determinations remain). Finally, because the Board denied Skretvedt's claim for T & P benefits for the same reasons that it denied his claim for incapability benefits, we will vacate the District Court's order granting summary judgment on the count challenging the Board's denial of Skretvedt's application for T & P benefits and remand it to the District Court. We assume that the District Court will direct that DuPont's Board consider this claim in the first instance, since even though Skretvedt is incapable of performing the duties of his previous position at DuPont, he may nevertheless be ineligible for T & P benefits.10

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

10. Skretvedt has also requested that he be awarded attorneys' fees pursuant to ERISA's discretionary fee-shifting provision. That section provides that in any action under ERISA "by a participant, beneficiary,

or fiduciary, the court in its discretion may allow a reasonable attorney's
fee and costs of action to either party." 29 U.S.C. S 1132(g)(1). The
question whether to award attorneys' fees to Skretvedt is a matter of
discretion, which we remand for the District Court to consider guided by
the five-factor analysis applied by courts in this circuit when considering
such fee applications. See McPherson v. Employees' Pension Plan of Am.
Re-Insurance Co., 33 F.3d 253, 254 (3d Cir. 1994).

27