**Denise GERHART**

v.

**MERCK & COMPANY, INC. and Metropolitan Life Insurance Company.**

**No. CIV.A. 01–337.**

United States District Court, E.D. Pennsylvania.

Dec. 10, 2001.

William H. Haller, Freedman & Lorry, P.C., Philadelphia, PA, for plaintiff.

E. Thomas Henefer, Stevens & Lee, Reading, PA, for defendants.

### MEMORANDUM AND ORDER

JOYNER, District Judge.

This case is now before the Court upon the parties' cross-motions for summary judgment. For the reasons set forth below, the plaintiff's motion shall be granted and the defendants' motion shall be denied.

1. Ms. Gerhart originally joined with two other Merck employees, Laura Meyers and Jayne Zerbenski in commencing this lawsuit. Ms. Meyers and Ms. Zerbenski have since settled

### History of the Case

Plaintiff, Denise Gerhart instituted this suit seeking declaratory and injunctive relief and monetary damages under the Employee Retirement Income Security Act, 29 U.S.C. § 1132 ("ERISA") arising out of the defendants' failure to pay her benefits under Merck's long term disability plan.[1] According to the record in this matter, Plaintiff began her employment with Merck in July, 1994 as a forklift truck operator at the defendant company's facility in West Point, Pennsylvania. In February, 1996, she injured her left wrist and arm at work and, although her arm was placed in a cast and she was directed to refrain from using her left arm for a time, she apparently had suffered nerve damage.

Although Ms. Gerhart returned to work as a security guard in April, 1996, her condition continued to deteriorate and she stopped working on April 12, 1999 due to her inability to use her left arm without severe pain. She applied for long term disability benefits under Merck's plan in November, 1999. In March, 2000, Plaintiff's claim for benefits was denied by Defendant Metropolitan Life Insurance Company ("Met Life"), the claims administrator. Plaintiff appealed this decision but Met Life upheld its earlier decision denying Plaintiff's claim in letters dated June 19, 2000 and July 18, 2000. In January, 2001, Ms. Gerhart commenced this action pursuant to Section 502(a)(1)(B) of ERISA. By way of the now-pending motions, both parties submit that they are entitled to the entry of judgment in their favor as a matter of law.

their claims with the defendants and hence the only claims remaining for disposition in this action are those of Ms. Gerhart.

## Summary Judgment Standards

It is recognized that the underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Under Fed.R.Civ.P. 56(c), summary judgment is properly rendered:

> "... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."

Stated more succinctly, summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–32, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, all facts must be viewed and all reasonable inferences must be drawn in favor of the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oritani Savings & Loan Association v. Fidelity & Deposit Company of Maryland,* 989 F.2d 635, 638 (3rd Cir.1993); *Troy Chemical Corp. v. Teamsters Union Local No. 408,* 37 F.3d 123, 125–126 (3rd Cir.1994); *Arnold Pontiac–GMC, Inc. v. General Motors Corp.,* 700 F.Supp. 838, 840 (W.D.Pa.1988). An issue of material fact is said to be genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## Discussion

As noted above, this lawsuit invokes the protections of Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). Under that statute,

> A civil action may be brought—
>
> (1) by a participant or beneficiary—
>
> ......................
>
> > (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

ERISA does not set out the standard of review for an action brought under § 1132(a)(1)(B) by a participant alleging that she has been denied benefits to which she is entitled under a covered plan. *Mitchell v. Eastman Kodak Company,* 113 F.3d 433, 437 (3d Cir.1997). The U.S. Supreme Court, however, specifically addressed this issue in its 1989 decision in *Firestone Tire and Rubber. Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Borrowing heavily from the principles of trust law, the Supreme Court in that case held that:

> "... a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.... Thus, for purposes of actions under § 1132(a)(1)(B), the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest. Of

course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion."

*Firestone*, 489 U.S. at 115, 109 S.Ct. at 956–957. In contrast, when reviewing the denial of benefits under ERISA where the plan commits discretion to the fiduciary, it is the "arbitrary and capricious" standard which is properly employed. *Skretvedt v. E.I. DuPont de Nemours and Co.*, 268 F.3d 167, 173–174 (3d Cir.2001). A court reviewing a benefits denial under the arbitrary and capricious standard must defer to the plan administrator unless the administrator's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Skretvedt*, 268 F.3d at 174, quoting *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377, 393 (3d Cir.2000) and *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993). This scope of review is narrow and the court is not free to substitute its own judgment for that of the administrator in determining eligibility for plan benefits. *Mitchell*, 113 F.3d at 439; *Abnathya*, 2 F.3d at 45.

As noted in *Firestone*, however, even when a plan commits discretion to a fiduciary or plan administrator, a reviewing court should employ the heightened standard of review either when the plan by its very design creates a special danger of a conflict of interest or when the beneficiary can point to evidence of specific facts calling the impartiality of the administrator into question. *Skretvedt, supra*, citing, *inter alia, Goldstein v. Johnson & Johnson*, 251 F.3d 433, 442 (3d Cir.2001). Two conditions that indicate a special danger of a conflict of interest that would warrant applying a heightened standard of review arise: (1) when a pension plan is unfunded, *i.e.* not actuarially grounded with the company making fixed contributions to the pension fund, but rather funded by the employer on a claim-by-claim basis; and (2) when a plan is administered by an administrator outside the company, such as an insurance company, that does not have strong incentives to keep employees satisfied by granting meritorious claims. *Skretvedt, supra.*, citing *Pinto*, 214 F.3d at 388.

It is for these reasons that the Third Circuit has adopted the "sliding scale" approach to analyzing potential conflicts of interest and thus determining which level of review to apply such that the greater the danger of a conflict of interest, the less deference the reviewing court should give to the administrator's benefits decision. *See: Pinto*, at 388. Under this approach, each case is examined on its facts and the court may take into account the sophistication of the parties, the information accessible to the parties, the exact financial arrangement between the insurer and the company, the current status of the fiduciary and the financial stability of the employer. *Pinto*, 214 F.3d at 392.

■ Applying all of the foregoing principles to the case at hand, we note that Merck's Long–Term Disability Plan does cede to the Claims Administrator (Met Life) discretion to determine eligibility for benefits.[2] Thus, we must apply the arbi-

---

**2.** Specifically, the Plan provides at Article VIII, Section 2:

The Claims Administrator shall make all determinations as to the right of any person to a benefit under the Plan. If the Claims Administrator grants a claim, benefits pay-

able under the Plan will be paid to the Participant as soon as practicable thereafter. If the Claims Administrator denies in whole or part any claim for a benefit under the Plan by a Participant, the Claims Administrator shall furnish the claimant with

trary and capricious standard in reviewing the defendants' determination to deny the plaintiff's claim and must defer to the plan administrator unless that decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." In so doing, we turn now to the plan which defines "total disability" as follows:

*"Total Disability"* shall mean

(i) for the duration of the Total Disability Eligibility Period and the first 24 months of benefit payments, the complete and continuous inability of the Participant to perform any and every duty of the Participant's occupation; and

(ii) for the period commencing after the end of such 24 months, the inability of the Participant to engage in any gainful employment for which the Participant is or may become reasonably qualified by education, training or experience. Total Disability shall not be deemed to exist during any period in which the Participant is not under the regular care and attendance of a legally qualified physician nor during any period in which the Participant engages in any occupation or performs any work for compensation or profit.

Total Disability shall not include disability caused by or resulting from

(i) active participation in war, or act of war, whether declared or not;

(ii) intentionally self-inflicted injuries; or

(iii) participation in or the commission of a felony.

Borrowing from the summary plan description, Defendant concluded that "total disability" meant:

" ... being unable to perform all material aspects of your occupation during the eligibility period and during the first 24 months that benefits are paid under this Plan. After that, in order to continue receiving LTD benefits, you must be unable to engage in any gainful employment for which you are or may become reasonably qualified by education, training or experience. Gainful employment means compensation (whether by wages, commission, earnings, profits, or otherwise) for services that would replace at least 60% of your base salary prior to your disability in a job that is reasonably available within up to 75 miles-the area may be less, depending upon the facts surrounding the disability and location-of your residence at the time your disability began. A job is reasonably available if an opening exists or the job is being performed within that geographic area, even if there is no current opening."

■ In this case, while recognizing that the statements, office notes and functional capacity evaluation of Plaintiff's attending physician, Dr. Scott Fried declared her to

notice of the decision not later than 90 days after receipt of the claim, unless special circumstances require an extension of time for processing the claim, in which event the Claims Administrator shall provide a written notice of the extension during the initial 90–day period. The written notice which the Claims Administrator shall provide to every claimant who is denied a claim for benefits shall set forth in a manner calculated to be understood by the claimant:
 (i) the specific reason or reasons for the denial;

(ii) specific reference to pertinent plan provisions on which the denial is based;
(iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
(iv) appropriate information as to the steps to be taken if the claimant wishes to submit his or her claim for review.

be totally disabled, it appears that the claim administrator disregarded Dr. Fried's finding on the ground that Dr. Fried only found that she was disabled from working as a fork lift driver, as opposed to a security guard. It was on the basis of this conclusion as well as Met Life's interpretation of Merck's written job description of the security guard position and the suggestion of Plaintiff's supervisor that a security guard could function using only one arm, that it denied Ms. Gerhart's claim for long term disability benefits.

In reviewing the record, however, we find that the defendant's claims diary notes reflect that Ms. Gerhart's supervisor indicated only that the writing requirements for the security guard position could be dictated, that people could be signed in using the computer system and that the doors are general public doors which could be opened with only one hand.

According to the company's written job description, a security officer is "responsible for protecting Company property, personnel, and visitors, preventing theft or loss of Company property and enforcing related Company rules. Under the supervision of the Lieutenant of the Guard or as instructed by the Sergeant of the Guard, [the security officer] alertly and conscientiously tours Company property ..., controls pedestrian and vehicle traffic to and from the site ..., and operates required equipment." The equipment which the security officer is required to operate includes the security alarm system, the tour reporting system, telephone call director, two-way radio, patrol vehicle and identification equipment, among other things. The security officer's duties consist of conducting preliminary investigations of on-site incidents; submitting written investigations and administrative reports; assuring that no unauthorized Company property is removed from the plant, tactfully

inspecting packages and vehicles, and assuring proper authorization and documentation of Company property leaving the site. In addition, the security officer must also control entry to the site, issue passes and badges to identify non-employees, monitor the security alarm system and report all violations thereof, maintain records of gate activities on various logs, passes and reports, prepare reports of incidents, patrol company property to check for activities or conditions which are unsafe, abnormal, illegal or against Company rules and regulations, operate telephone call director and handle emergency calls as directed. Finally, security officers are subject to working in all weather conditions and are required to sit, walk or stand for long periods of time and to remain on duty until properly relieved. It thus appears to this Court that while certain functions of the security guard position can undoubtedly be performed using just one arm, there are other functions which likely cannot be. Ms. Gerhart's supervisor does not appear to have addressed the issue of whether these other functions (i.e. operating equipment other than telephone or computer, assuring that no unauthorized property leaves plant site, preventing theft or loss of company property, etc.) could be performed using only one arm.

What's more, we find that in reviewing the reports, statements, correspondence and functional capacity evaluation of Dr. Fried and contrary to the defendant's assertion, he did indicate that the plaintiff was disabled from working not only as a forklift operator but also as a security guard. To be sure, Dr. Fried's report of April 26, 2000 clearly reads, in relevant part:

> Overall, Denise showed the ability to work at a sedentary work level with a 5 lb restriction on the right. She really had no carrying tolerance or lifting tol-

erance or regular activity tolerance on the left.

It is felt that this lady has still significant residual from her upper extremity issues although left side still is much worse than right.

My recommendation is for vocational rehabilitation. Denise cannot return to her former employment. She should look for a job where she is basically seeing, speaking, and not utilizing her arms.

My recommendation is vocational rehabilitation and training her for jobs which would require her to see, speak and utilize her brain capacity and her arms on a minimal basis. These should be considered her permanent limitations.

. . . . To clarify for Ms. Gibbons the situation, Denise is disabled from her regular occupation and profession. This remains as noted above. She is not capable of performing the security guard job and, therefore, is currently still disabled . . .

Interestingly, there is nothing in the record of this case to contradict Dr. Fried's medical findings and opinion and as Defendants have acknowledged, the decision to deny benefits was predicated upon Met Life's interpretation of the plaintiff's job description as aided by her supervisor's statement. While there is also no evidence as to the sophistication of the parties, the exact financial arrangement between the insurer and the company, or the financial stability of the employer, it is also clear that Met Life is an administrator outside of the defendant employer with the result that it does not have the same strong incentives to keep Merck's employees satisfied by granting meritorious claims.

Given that there are numerous duties which a security guard is expected to perform other than opening doors, sign-

ing people in and writing reports and in view of the uncontradicted medical evidence that Plaintiff is disabled from working in this capacity, we find that the decision to deny Plaintiff long term disability benefits under the Merck plan was without reason and unsupported by the evidence presented to the claim administrator. We therefore conclude that this decision was arbitrary and capricious and we now accordingly deny the defendants' motion for summary judgment and enter summary judgment in favor of the plaintiff.