**Sharon MORNINGRED, Plaintiff,**

v.

**DELTA FAMILY–CARE & SURVIVORSHIP PLAN, Sedgwick Claim Management Services, INC., Defendants.**

**C.A. No. 10–272–MPT.**

United States District Court, D. Delaware.

March 29, 2011.

Order of Clarification June 30, 2011.

---

Gary W. Aber, Aber, Baker & Over, Wilmington, DE, for Plaintiff.

Herbert Weiswasser Mondros, Margolis Edelstein, Dominick T. Gattuso, Proctor Heyman LLP, Wilmington, DE, John K. Larkins, John T. McDonald, Pro Hac Vice, for Defendants.

## MEMORANDUM ORDER

MARY PAT THYNGE, United States Magistrate Judge.

Sharon Morningred filed suit against Delta Airlines, the Delta Family–Care & Survivorship Plan ("the Plan") and Sedgwick Claim Management Services (Sedgwick CMS) alleging a violation of § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA).[1] Morningred asserts that Sedgwick CMS, the delegated administrator of the Plan, arbitrarily and capriciously denied her short-term disability benefits following a workplace injury. Defendants filed a motion for summary judgment arguing that Sedgwick CMS's decision to deny Morningred continued short term disability benefits for the period between

---

1. 29 U.S.C. § 1132(a)(1)(B).

July 1, 2008 to November 28, 2008 was neither arbitrary nor capricious. Morningred argues that Sedgwick CMS's review of her case failed to consider all of the relevant diagnoses, the opinion of her treating physician, and a workers' compensation agreement finding that Morningred was totally disabled. For the reasons stated herein, the court grants in part and denies in part defendants' motion for summary judgment, grants in part and denies in part Morningred's cross-motion for summary judgment, and finds that the denial of Morningred's continued short-term disability benefits within a specific time-period was not supported by substantial evidence.

## I. Factual and Procedural History

At the time of her injury, Morningred was employed as a rotating Baggage Service Agent, Ticket Counter agent, Lobby and/or Lobby Assistant Agent, and/or Gate Agent. These jobs required she be able to lift bags of luggage weighing between 70 and 99 pounds. On an average work day, Morningred lifted 400 bags and 500 pieces of freight or mail. Her job also required that she be able to work eight and one-half hours per day, and be capable of walking, pushing, pulling, lifting, reaching, bending, and kneeling.

At work on May 29, 2008, Morningred slipped and fell on a puddle of water. According to a medical examination conducted that same day, Dr. Louis Lam reported that Morningred complained of pain in her left knee and both ankles. Dr. Lam diagnosed a cervical strain, a right shoulder sprain, a right elbow strain, a right wrist strain, a lumbosacral strain, a left knee contusion, and a bilateral ankle strain. X-rays taken at that time showed that Morningred had not suffered a fracture or dislocation of her ankle or knee.

Morningred subsequently began receiving treatment from her physician, Dr. Debra Hudes, who noted that Morningred was unable to work.

The Delta Family–Care & Survivorship Plan provides short-term and long-term disability benefits to eligible participants who suffer an injury while at work. Morningred applied for short-term disability benefits under the Plan. Short-term disability benefits require a demonstration that the claimant is "unable to engage in [her] customary occupation as a result of a demonstrable injury or disease...."[2] Pursuant to sections 12.02(i) and 12.04, the Plan delegates claim administration duties to Sedgwick CMS and, pursuant to a service agreement contract, Sedgwick CMS is granted all discretionary power to interpret the Plan and make benefit determinations. By a letter dated June 17, 2008, Sedgwick CMS approved short-term disability benefits for the period between May 31, 2008 through June 30, 2008. The letter noted that if, at the end of the benefit period, Morningred was unable to resume her employment duties, additional medical documentation would be required to approve further benefits.

Following the expiration of the initial short-term disability benefits, Morningred sought re-certification of benefits under the Plan and submitted further medical documentation in support of a diagnosis of complex regional pain syndrome ("CRPS"). According to an August 6, 2008 report, Morningred's orthopedic surgeon Dr. Eric Johnson diagnosed CRPS in her left lower extremity and recommended physical therapy.

Via letter on September 30, 2008, Sedgwick CMS denied the claim, citing "no objective medical documentation to sup-

2. D.I. 31, Ex. A at DPPlan060062.

port [the] diagnosis [and] no consistent treatment plan, other than physical therapy, appropriate for this diagnosis." [3] The letter concluded by informing Morningred of her right to administratively appeal the decision and advised her to submit information from all physicians who treated her including narrative reports and physical limitations, her course of treatment, frequency of doctor's visits, medications prescribed, the diagnostic studies conducted during that period including test result, X-rays and clinical findings, and any other information specific to the condition or that may help in reviewing the claim.

Morningred appealed the decision on October 16, 2008, stating that although she had been cleared to return to work in a sedentary position, her manager disallowed her return until medical notice that she could return to her "normal functions within 60 days." She stated her doctor was unwilling to provide such a diagnosis. She expressed interest in returning to work in a sedentary position as soon as possible and stated that she was willing to transfer to Atlanta for such work. To support her claim of CRPS, Morningred submitted hundreds of pages of medical records to Sedgwick CMS.

Sedgwick CMS forwarded the records to Insurance Appeal Limited to perform an independent review. On March 4, 2009, Insurance Appeal Limited issued a report concluding that due to the lack of physical damage and because of a normal electrodiagnostic test, Morningred should have been able to return to work as of July 1, 2008 through November 28, 2008.

Sedgwick CMS subsequently upheld the denial of short-term disability benefits by a letter dated April 8, 2009. Morningred filed this action on April 6, 2010. Defendants filed a motion for summary judgment on December 8, 2010. Morningred filed her answering brief on January 20, 2011 to which defendants replied on February 1, 2011.

## II. Standard of Review

Where an ERISA plan grants the administrator discretionary authority to determine eligibility for benefits, the court reviews a § 502(a)(1)(B) challenge to a termination of benefits under an arbitrary and capricious standard.[4] The Plan affords the delegated administrator discretion in virtually all aspects concerning interpretation and administration of the Plan including "[t]he discretionary authority to interpret and construe the Plan, and decide all questions of eligibility of any Employee ..." [5] "Under the arbitrary or capricious (or abuse of discretion) standard of review, the District Court may overturn a decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." [6] The court will review the procedural factors underlying the administrator's decision-making process and will "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." [7] That court's review of these determinations is based "on the record available to the plan administrator in making its own decision; if there is not sufficient evidence in the defendants' record to

---

3. D.I. 31, Ex. C at SMM 00507.

4. *See Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 115–16, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008).

5. D.I. 31, Ex. A at DPPlan060045.

6. *Steele v. Boeing Co.,* 225 Fed.Appx. 71, 74 (3d Cir.2007).

7. *Glenn,* 554 U.S. at 117, 128 S.Ct. 2343.

support their decision ... it must be reversed." [8]

In her answering brief in opposition to defendants' motion for summary judgment, Morningred asks the court to enter summary judgment in her favor *sua sponte* arguing that "district courts are widely acknowledged to possess the power to enter summary judgment *sua sponte*." [9] Although defendants recognize Morningred's request, and constructively acknowledge that they are on notice to submit with all of their evidence, the court cautions Morningred that the proper avenue for relief in this situation is a cross-motion for summary judgment, not a request for the court to act *sua sponte*. Because of the nature of this claim and because of defendants' recognition of Morningred's request that the court treat her answer as a motion for summary judgment, the court will treat the briefing as cross-motions for summary judgment. [10]

A motion for summary judgment should be granted where the court finds no genuine issues of material fact from its examination of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, and that the moving party is entitled to judgment as a matter of law. [11] A party is entitled to summary judgment where "the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party or where the facts are not disputed and there is no genuine issue for trial." [12]

This standard does not change merely because there are cross-motions for summary judgment. [13] Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist. [14]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court to grant summary judgment for either party." [15]

## III. Discussion

### A. Initial Denial Letter

ERISA requires that a compliant plan "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." [16] The accompanying regulations set forth "minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficia-

**8.** *Kosiba v. Merck & Co.*, 384 F.3d 58, 69 (3d Cir.2004).

**9.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**10.** *Id.* (finding that a district court may enter summary judgment *sua sponte* "so long as the losing party was on notice that she had to come forward with all of her evidence.").

**11.** *Ford v. Unum Life Ins. Co. of Am.*, 465 F.Supp.2d 324, 330 (D.Del.2006).

**12.** *Delande v. ING Employee Benefits*, 112 Fed.Appx. 199, 200 (3d Cir.2004).

**13.** *Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir.1987).

**14.** *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968).

**15.** *Krupa v. New Castle County*, 732 F.Supp. 497, 505 (D.Del.1990).

**16.** 29 U.S.C. § 1133(1).

ries." [17] The regulations require a plan administrator to provide written notification of any adverse benefit determination setting forth

> [I]n a manner calculated to be understood by the claimant ... (i) [t]he specific reason or reasons for the adverse determination; (ii) [r]eference to the specific plan provisions on which the determination is based; (iii) [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.] [18]

Sedgwick CMS's initial denial letter, dated September 30, 2008, denied Morningred's short-term disability benefit recertification claim because there was "no objective medical documentation to support [the] diagnosis." [19] The letter also noted that in Dr. Johnson's diagnosis report, "there appears to be no consistent treatment plan, other than physical therapy, appropriate for this diagnosis." [20] In her answering brief, Morningred argues that the initial denial letter is impermissibly vague concerning the type of medical information necessary to cure the defect in her claim.

■ Although an ERISA beneficiary may bring a civil action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan," [21] the court generally will not entertain an ERISA claim unless the plaintiff has exhausted the remedies available under the plan. [22] "Courts require exhaustion of administrative remedies 'to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned.'" [23]

■ The initial denial letter requested that Morningred include in her appeal, "the reason(s) you believe your claim was improperly denied...." [24] Morningred did not outline any procedural defect in her appeal letter and does not direct the court to any other point in the administrative record demonstrating an appeal of this alleged procedural defect in Sedgwick CMS's initial denial letter. Where ERISA requires claimants first address their complaints to a designated fiduciary to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits, the court will not intervene. [25] As a result, the court finds that Morningred has waived this issue by her failure to raise it on appeal to the plan administrator. [26]

---

**17.** 29 C.F.R. § 2560.503–1(a).

**18.** *Id.* § 2560.503–1(g)(1).

**19.** D.I. 31, Ex. C at SMM 00507.

**20.** *Id.*

**21.** 29 U.S.C. § 1132(a)(1)(B).

**22.** *Weldon v. Kraft, Inc.,* 896 F.2d 793, 800 (3d Cir.1990).

**23.** *Harrow v. Prudential Ins. Co. of Am.,* 279 F.3d 244, 249 (3d Cir.2002) (quoting *Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir.1980)).

**24.** D.I. 31, Ex. C at SMM 00508.

**25.** *Zipf v. Am. Tel. And Tel. Co.,* 799 F.2d 889, 892 (3d Cir.1986) ("When a plan participant claims that he or she has unjustly been denied benefits, it is appropriate to require participants first to address their complaints to the fiduciaries to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits.").

**26.** The court notes that Morningred cites to *Skretvedt v. E.I. DuPont de Nemours and Co.,* 268 F.3d 167, 178 n. 8 (3d Cir.2001) wherein the Third Circuit expressed its discomfort with a plan's request for "objective medical

*B. Analysis of All Relevant Diagnoses*

 The Third Circuit has found that "[a]n administrator's failure to address all relevant diagnoses in terminating a claimant's benefits is [a] cause for concern that suggests the decision may have been arbitrary and capricious." [27] Morningred argues that although Sedgwick CMS documented in its claims files "objective criteria for CRPS," the administrator ignored the treating physicians' observations of those objective criteria.

Sedgwick CMS's notes summarize the clinical signs and criteria necessary to diagnose CRPS.

> The objective diagnostic criteria for CRPS are comprised of eight criteria, six clinical signs and two radiographic signs. The six clinical signs are: swelling, local skin color change of red or purple, local sweating changes, local temperature changes, reduced passive range of motion in contiguous or contained joints, local alteration of skin texture.... To identify the existence of radiographic signs, a triple-phase bone scan may be used to reveal osteoporosis or increased circulation to the joints in the affected areas.[28]

In response to these criteria, Morningred counters that the submitted medical records show diagnoses outlining these very criteria. In support of "swelling," Morningred points to a December 11, 2008 report by Dr. Bruce H. Grossinger finding "edema in the left ankle," [29] an August 6, 2008 report by Dr. Johnson finding "expected swelling" [30] and a October 31, 2008 visit report by Dynamic Physical Therapy noting "significant increase in left lower extremity edema." [31] To demonstrate the presence of local skin color change, Morningred directs the court's attention to a September 30, 2008 report by Dr. Robert Varipapa describing a "[v]ery slight discoloration and slight coldness of the left lower extremity in comparison to the right" [32] as well as a notation by Dr. Grossinger stating that he "reviewed a sequential packet of photographs which reflect the discoloration, swelling and deformity of the left knee and ankle." Morningred similarly illustrates examples where these and other doctors noted symptoms similar to the listed objective diagnostic criteria.

In rebuttal, defendants argue that although Dr. Veripapa noted "some discoloration," he also remarked that Morningred had been subjected to an "extensive evaluation including a variety of MRI studies of the spine and leg along with EMG studies which have been negative." [33] Defendants also reference a September 22, 2008 electromyographic report prepared by Dr. Wai Won Phoon noting Morningred's normal

---

evidence." In *Skretvedt*, the claimed disability was a psychological condition whereas in the instant case, the National Institute of Health has outlined specific symptoms for CRPS and has identified certain tests that may be helpful in diagnosing the condition. *See Complex Regional Pain Syndrome Fact Sheet* (Feb. 18, 2011), http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/detail_reflex_sympathetic_dystrophy.htm# 174993282.

27. *Miller v. Am. Airlines, Inc.*, 632 F.3d at 852 (3d Cir.2011) (citing *Kosiba v. Merck & Co.*, 384 F.3d 58, 68–69 (3d Cir.2004)).

28. D.I. 31, Ex. C at SMM 00071.

29. D.I. 38 at B0298.

30. D.I. 37 at B0064.

31. *Id.* at B0143.

32. *Id.* at B0060.

33. *Id.* at B0061.

deep tendon reflexes, fair strength, and normal sensations.[34]

In further support of their findings, defendants cite to a report from a neurologist, Dr. Howard I. Levin concluding that "the array of symptoms [Morningred described] are clearly inconsistent and out of proportion to the injuries and cannot be support by any findings on her examination or diagnostic studies."[35] Levin stated that while Morningred's symptoms "suggest that she is suffering from complex regional pain syndrome or disuse syndrome," there was no evidence that would account for the symptoms in her neck, upper back, or left knee.[36] Levin recommended that Morningred should emphasize mobility and that inactivity may have caused the problems in her left leg.[37] Finally, Levin advised that Morningred was unable to return to her previous position at that time but should have been able to work in a sedentary position.[38]

Following Morningred's supplemental submission, Sedgwick CMS referred her claim to Insurance Appeal Limited to perform an independent review. On March 4, 2009, Insurance Appeal Limited issued a report in which the reviewing doctor, Dr. Robert L. Marks, summarized the medical evidence submitted, outlined his attempts to discuss Morningred's claim with her physicians, and concluded that the description of the injury and the described findings did not support physical disability from claimant's regular unrestricted job from July 1, 2008 through November 28, 2008.[39] According to Marks, the record "indicated that there [was] swelling and tenderness [but] [i]maging revealed only mild degenerative changes. Although a fall could have caused a sprain injury, the lack of solid physical findings of major severity is not supportive of complete disability from work (following the six to eight weeks of convalescence)."[40] Marks opined that "tenderness and even [range of motion] limitations can be more related to subjective experiences (particularly in the presence of anxiety or fear) rather than actual organic anatomic abnormalities," and opined that swelling and discoloration may be caused by lack of mobilization.[41]

Marks subsequently explained the rationale behind his conclusion stating that the "various symptom complaints involve areas remote from the ankle so that reflex sympathetic dystrophy or complex regional pain syndrome cannot explain the entire clinical presentation."[42]

In the presence of conflicting medical opinions proffering varying causes of Morningred's disability and her ability to return to work, the Plan granted Sedgwick CMS complete discretion to weigh the conflicting evidence and render a decision. As a result, the court does not find any abuse of that discretion in Sedgwick CMS's decision to credit the opinions of certain medical evidence over other contrary medical evidence.[43]

## C. Consideration of Morningred's Treating Physician's Opinions

■ In December of 2008, Morningred's counsel referred her to Dr. Bruce Gros-

---

**34.** D.I. 31, Ex. C at SMM 00439.

**35.** *Id.* at SMM 00188.

**36.** *Id.*

**37.** *Id.* at SMM 00199.

**38.** *Id.*

**39.** *Id.* at SMM 00038.

**40.** *Id.*

**41.** *Id.* at SMM 00039.

**42.** *Id.*

**43.** *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831–34, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

singer, a certified independent examiner. In a December 22, 2008 letter to Dr. Johnson, Dr. Grossinger found that Morningred had "a multiplicity of traumatic injuries." [44] He recounted Morningred's medical history, described her symptoms, and described his physical examination of Morningred.[45] He concluded that Morningred had reflex sympathetic dystrophy ("RSD") of the left lower extremity ... [and] clearly cannot return to working as a baggage service agent, repetitively lifting and carrying bags and suitcases up to 100 lbs." [46] He found that Morningred would require mobilization and gentle stretching but that she was temporarily disabled from any and all gainful employment on a temporary basis, until she received benefit from her treatment.[47] Finally, Dr. Grossinger indicated that he would remain her treating physician.[48] Morningred argues that neither the initial letter from Sedgwick CMS denying benefits nor the final letter denying benefits mentioned, described, or explained Dr. Grossinger's opinions or Sedgwick CMS's "sole total reliance" upon the records exam performed by Dr. Marks.

In *Nord,* the Supreme Court stated that although Plan administrators were not required to "accord special weight to opinions of a claimant's physicians," they "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." [49]

The initial denial letter is dated September 30, 2008—approximately two months before Morningred first visited Dr. Grossinger and five months before Dr. Marks' letter summarizing his review of Mor-

ningred's medical information. As a result, the court finds no violation of the Supreme Court's edict that plan administrators weigh all credible evidence as it concerns Dr. Grossinger's findings.

At the onset, the final denial letter states that Sedgwick CMS reviewed records from a number of doctors, rehabilitation and therapy centers, and medical specialists. Included in that list was Dr. Grossinger. The letter then describes Dr. Marks' attempts to contact Morningred's physicians and his discussions with the doctors he contacted. It states that Dr. Marks was unable to schedule a teleconference with Dr. Grossinger. However, the letter recounts Dr. Michael Kelman's observations that Morningred complained of low back and lower extremity pain, that she was ambulating with an aircast and crutch, and that she was unable to perform her regular job duties. It also recounts Dr. Trent Ryan's finding that Morningred had some swelling, hypersensitivity to touch, flexor spasms, that she required crutches, and that she was incapable of performing her job duties. The letter provides that a "thorough review of the available medical documentation in the file indicated that [Morningred complained] of a sprained ankle and low back," [50] she was diagnosed with RSD and CRPS, and that examination findings "revealed tenderness and [her] imaging studies revealed mild degenerative changes." [51]

Besides Dr. Grossinger's conclusion regarding Morningred's ability to work and his diagnosis of CRPS, Morningred does not identify any diagnosis or specific symp-

**44.** D.I. 38 at B0298.

**45.** *Id.*

**46.** *Id.* at B0298–99

**47.** *Id.* at B0299.

**48.** *Id.* at B0300.

**49.** *Nord,* 538 U.S. at 833, 123 S.Ct. 1965.

**50.** D.I. 31, Ex. C at SMM 00033.

**51.** *Id.*

tom that Sedgwick CMS and Dr. Marks failed to acknowledge. The letter clearly recognizes that Morningred had been diagnosed with CRPS and at least two doctors had found her condition to be totally disabling. Dr. Marks' opinion states that he reviewed "PROG NOTES" from "Grossinger NeuroPain Specialists."[52] Although he did not specifically describe Dr. Grossinger's diagnosis of CRPS, he recognized that Morningred had been diagnosed with CRPS and explained that the "various symptom complaints [involving] areas remote from the ankle" cannot be explained by CRPS or RSD. He explains that, because "[t]here is no evidence of major structural damage to the ankle," he determined that Morningred had suffered a sprain injury from which she should have healed after a few weeks of convalescence.[53] He concluded by stating that "in the absence of structural damage and a normal electrodiagnostic test," Morningred required activation and progressive mobility and should have been able to return to work as of July 1, 2008 to November 28, 2008. The court finds that Sedgwick did not arbitrarily refuse to credit Dr. Grossinger's medical opinion, but instead gave more weight to Dr. Marks' contrary medical opinion. In the presence of competing medical opinions, the plan administrator is granted discretionary power to weigh the conflicting evidence.[54] As a result, the court cannot find that Sedgwick CMS acted arbitrarily or capriciously because of a failure to recognize or acknowledge Morningred's treating physicians.

## D. Worker's Compensation Claim

According to Morningred, she and Delta Airlines entered into a Workers' Compensation Agreement on July 16, 2008,[55] wherein the parties agreed that Morningred was totally disabled. Delta reaffirmed this agreement and Morningred's total disability via a subsequent State of Delaware "Agreement as to Compensation."[56] Morningred argues that Sedgwick CMS's failure to explain the disagreement between its conclusion and the worker's compensation agreement calls into question the neutral character or fairness of the administrator's decision.

The Third Circuit has stated that a "settlor of an ERISA plan is not required to incorporate worker's compensation standards into the plan, and unless such standards are incorporated [there is] no reason why they should bind the plan's trustees or administrator."[57] There is no evidence that the Plan incorporates any such standards into the decision-making process. Additionally, Morningred does not state and the agreement does not provide a definition of "disability" as it applies to the workers' compensation claim, the reason for Morningred's disability under the workers' compensation claim, or the medical evidence that led to the total disability

---

52. *Id.* at SMM 00035.

53. *Id.* at SMM 00039.

54. *Nord,* 538 U.S. at 831–34, 123 S.Ct. 1965.

55. D.I. 36 at 2. Morningred cites to D.I. 37 at B0001 as evidence of this agreement. Due possibly to a typographical error, that evidence is not found at the citation noted and the court is unable to draw a conclusion from the evidence found.

56. D.I. 37 at B0028.

57. *Moats v. United Mine Workers of Am. Health and Ret. Funds,* 981 F.2d 685, 689 (3d Cir.1992) (citing *Kunstenaar v. Connecticut General Life Ins. Co.,* 902 F.2d 181 (2d Cir. 1990); *Brown v. Ret. Comm. of Briggs & Stratton Ret. Plan,* 797 F.2d 521 (7th Cir.1986); *Glover v. South Central Bell Tel. Co.,* 644 F.2d 1155 (5th Cir.1981); *McNamara v. Journal Co.,* 581 F.Supp. 927 (E.D.Wisc.1984); *Paterson v. Sw. Bell Tel. Co.,* 411 F.Supp. 79 (E.D.Ok.1976)).

finding. Without more, the court cannot determine that an unbinding workers' compensation agreement is evidence of the administrator's arbitrary and capricious denial of benefits.

### E. Calculation of Morningred's Disability

■ In their briefing, defendants acknowledge that "had [Morningred] been encouraged to return [to work], Dr. Marks felt that she would have been able to return to work as of July 1, 2008 [and that] it was this opinion questioning [Morningred's] condition and its effect on her ability to work on which Sedgwick CMS ultimately relied." [58] In his review, Dr. Marks repeatedly states his opinion that, with proper treatment, Morningred should have been able to return to work after a six to eight week convalescence period. [59]

The parties agree that Morningred was injured on May 29, 2008. According to Dr. Marks, whose opinion Sedgwick CMS "ultimately relied," Morningred would not have been able to return to work until an unknown date between July 9, 2008 and July 23, 2008, respectively six to eight weeks after Morningred's injury. However, Sedgwick CMS concluded that its medical findings did not "support physical disability from performing [Morningred's] regular unrestricted job from July 1, 2008 through November 28, 2008." Sedgwick CMS's ruling denying short-term disability from July 1, 2008 through November 28, 2008 contradicts Dr. Marks' finding that Morningred required a six to eight week recovery period following her injury. As a result, the court finds that Sedgwick CMS's finding regarding the date that Morningred was able to return to work is not supported by substantial evidence. [60]

## IV. Remedy

■ Morningred asks the court to enter judgment for short-term disability benefits in her favor and to remand to the administrator to consider an application for long-term disability benefits. However the proper remedy in such situations is a remand to Sedgwick CMS for a determination of whether Morningred was unable to engage in her customary occupation as a result of a demonstrable injury or disease. [61] If Sedgwick CMS determines that Morningred is entitled to short-term disability benefits throughout the short-term disability period, Morningred must then exhaust her administrative remedies be-

---

58. D.I. 41 at 4.

59. See D.I. 31, Ex. C at SMM 00038 ("After six to eight weeks post injury (sprain/strain type), one could expect reasonably good recovery."); Id. ("The description of the injury and the lack of major anatomic findings do not support a disability from work after the initial six to eight weeks of convalescence."); Id. ("Although a fall could have caused a sprain injury, the lack of solid physical findings of major severity is not supportive of complete disability from work (following the six to eight weeks of convalescence).").

60. The court does not find the discrepancy in Dr. Marks' report is evidence of an unlawful or impermissible bias against Morningred. Rather, the error appears to be a result of (1) an answer to a direct question "Is the employee disabled from her regular unrestricted job as of 7/01/08 to 11/28/08" and (2) a mathematical mistake. There is no evidence demonstrating any bias on behalf of Dr. Marks and his numerous and concurrent references to Morningred's necessary "six to eight weeks" of convalescence and the July 1, 2008 to November 28, 2008 disability period suggest nothing more sinister than an error in counting.

61. See generally Conkright v. Frommert, —— U.S. ——, 130 S.Ct. 1640, 1644, 176 L.Ed.2d 469 (2010) (finding that "a single honest mistake in plan interpretation" does not strip the administrator of deference granted to them by the plan and ERISA).

fore appealing to the court for a judgment concerning long-term disability.

## V. Conclusion

The court finds that Morningred's procedural claim concerning Sedgwick CMS's initial denial letter is waived due to her failure to exhaust administrative remedies. The court also finds that the Plan and Sedgwick CMS properly considered all the relevant medical evidence and properly exercised its discretion to weigh conflicting medical evidence in termination Morningred's STD benefits. Sedgwick CMS, and the independent medical examiner upon whom Sedgwick relied, properly recognized Morningred's physicians' conclusions that she was totally disabled as a result of complex regional pain syndrome. Additionally, the court finds that the Plan was not bound by the Morningred's workers' compensation claim and the bare payment agreement, without more, cannot evidence a violation of the administrator's discretion.

However, Dr. Marks' decision is inconsistent regarding the dates of Morningred's disability status and, as a result, Sedgwick CMS's reliance upon that report to deny Morningred's short-term disability benefit for the period between July 1, 2008 and July 23, 2008 is not supported by substantial evidence. Therefore, consistent with the findings herein, defendants' motion for summary judgment (D.I. 30) and Morningred's cross-motion for summary judgment (D.I. 36) are hereby granted in part and denied in part. The court remands this case to the administrator for a determination of whether Morningred was unable to engage in her customary occupation as a result of a demonstrable injury or disease during the time period between July 1, 2008 and July 23, 2008.

1. 29 U.S.C. § 1132(a)(1)(B).

## MEMORANDUM ORDER

Plaintiff Sharon Morningred filed suit against defendants Delta Family–Care & Survivorship Plan ("the Plan") and Sedgwick Claim Management Services ("Sedgwick CMS") on April 6, 2010 following Sedgwick CMS's denial of short-term disability benefits and the denial of an administrative appeal thereof. In that action, Morningred alleged Sedgwick CMS violated § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA)[1] by arbitrarily and capriciously denying her benefits short term disability benefits.

In a memorandum order dated March 29, 2011, the court granted in part and denied in part Sedgwick CMS's motion for summary judgment finding that, although Sedgwick CMS properly considered all the relevant evidence, Sedgwick CMS's ultimate finding did not correspond to the evidence. The court remanded the case to the plan administrator for a decision in accordance with the memorandum order. Following the issuance of the court's order, defendants filed a motion for clarification regarding the scope of the remand and plaintiff filed a motion for reargument.

## I. Defendants' Motion for Clarification

In their motion for clarification, defendants ask the court to clarify its order and find that the only issue to be covered on remand is the question of claimant's disability between July 1, 2008 and July 23, 2008. Defendants also ask the court to find that Morningred has no basis for further claiming any short-term disability benefits under the Plan from July 24, 2008 through November 28, 2008. In her answer, Morningred argues that the court's order is unclear whether the it

constitutes an interlocutory decision or a final judgment. If the order constitutes an interlocutory order, Morningred argues, the court is required to set a time limit for Sedgwick CMS to make a decision. Further, Morningred argues, the court does not provide for any retention of jurisdiction following a decision on remand.

In its decision, this court found that Sedgwick CMS "ultimately relied" on the medical opinion of Dr. Robert L. Marks who found that, with proper treatment, Morningred should have been able to return to work after a six to eight week convalescence period following her injury. Due to an apparent error in arithmetic, however, this convalescence period did not correspond to Sedgwick CMS's disability finding. Consequently, the court ordered a remand for a determination of whether Morningred was unable to engage in her customary occupation as a result of a demonstrable injury or disease during the time period between July 1, 2008 and July 23, 2008. The court found that Sedgwick CMS's decision to deny short term disability benefits following this six to eight week convalescence period is supported by substantial evidence. This was the court's only finding regarding the remand. Additionally, because the parties both conceded that the issue of long term disability benefits was premature without a decision on the subject by the administrator, the court did not address or decide long term disability benefits.

The Third Circuit has defined a "judgment" as "a decree and any order from which an appeal lies." [2] Generally, the Third Circuit has also found that "district court orders remanding cases to administrative agencies are not final and appealable." [3] The exception to the general rule applies "when a District Court finally resolves an important legal issue in reviewing an administrative agency action and denial of appellate review before remand to the agency would foreclose appellate review as a practical matter." [4] In the instant case, neither party has alleged that remand would foreclose appellate review as a practical matter. Consequently, the court's decision to remand is not considered final for the purposes of an appeal to a higher court and is an interlocutory order. Therefore, any appeal from Sedgwick CMS's decision pursuant to the court's order remains within the jurisdiction of this court.

## II. Motion for Reargument

In a separate motion for reargument, Morningred seeks to correct a clear error of fact and prevent manifest injustice regarding the court's finding of waiver and certain arguments by defendants.

■■■ Reargument under the District of Delaware's local rules "attempts to balance the interests in obtaining a final decision on matters presented to the Court and the recognition that the Court, like all others, is capable of mistake and oversight." [5] Well-grounded motions for reargument thus "present the court with an opportunity to correct erroneous rulings." [6]

2. *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 353 (3d Cir.1981) (quoting Fed.R.Civ.P. 54).

3. *Bhd. of Maintenance Way Employees v. Consol. Rail Corp.*, 864 F.2d 283, 285 (3d Cir. 1988).

4. *Kreider Dairy Farms, Inc. v. Glickman*, 190 F.3d 113, 120 (3d Cir.1999).

5. *Brambles USA, Inc. v. Blocker*, 735 F.Supp. 1239, 1241 (D.Del.1990) (citations omitted).

6. *BP Amoco Chem. Co. v. Sun Oil Co.*, 200 F.Supp.2d 429, 432 (D.Del.2002).

 Such motions are granted sparingly, however, and in narrow circumstances.[7] A court will grant reargument when: (1) the court has patently misunderstood a party; (2) the court has made a decision outside the adversarial issues presented to the court by the parties; or (3) the court has made an error not of reasoning but of apprehension.[8] Reargument may also be appropriate where the moving party shows (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issued its order; or (3) the need to correct a manifest injustice.[9]

### A. Waiver of Procedural Defects in the Initial Denial Letter

 In the memorandum order, the court found that Morningred had waived her claim regarding certain procedural defects in Sedgwick CMS's initial denial letter due to her failure to raise the issue to the administrator. In her present motion, Morningred counters that the denial letter did not explicitly state that procedural insufficiencies must be first presented to the administrator and that Morningred's present counsel raised the issue regarding the procedural defects to Sedgwick CMS in a letter dated July 9, 2009.

The administrator initially denied Morningred's claim on September 30, 2008 and rendered its final decision on April 8, 2009. Three months after Sedgwick CMS's final decision, counsel for plaintiff informed Sedgwick CMS that plaintiff had retained his representation in her pursuit for both short term and long term disability benefits. In his July 2009 letter, plaintiff's counsel requested Sedgwick CMS re-open the appeal process with regards to the administrator's September 30, 2008 denial of short term disability benefits due, in part, to vagueness, the administrator's failure to reference the specific plan provisions upon which the denial was based, and the administrator's failure to provide plaintiff with a copy of the Plan. On August 7, 2009, a representative for Sedgwick CMS denied the request to reopen the appeal stating that under the Plan's procedures, a claimant is afforded only one level of appeal and that administrator cannot reopen the appeal process upon its exhaustion.[10]

In its initial motion for summary judgment, Sedgwick CMS argued that Morningred's claim was procedurally barred for a failure to exhaust her administrative remedy. However, the record demonstrates that the administrator provided Morningred with a substantive response to her claim. After denying Morningred her request to reopen the appeal due to the

---

7. See Del. L.R. 7.1.5; BP Amoco, 200 F.Supp.2d at 432.

8. See, e.g., Schering Corp. v. Amgen, Inc., 25 F.Supp.2d 293, 295 (D.Del.1998) (citing Brambles, 735 F.Supp. at 1241).

9. See, e.g., Donald M. Durkin Contracting, Inc. v. City of Newark, Civ No. 04–163, 2006 WL 2724882, at *3 (D.Del. Sept. 22, 2006) (citing Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir.1999) (discussing standard for motion to alter or amend a judgment under Fed.R.Civ.P. 59(e))); see also, e.g., New Castle County v. Hartford Accident and Indem. Co., 933 F.2d 1162, 1176–77 (3d Cir.1991)

(stating that a motion for reargument under local rules challenging the correctness of a previously entered order is considered the "functional equivalent" of a motion under Rule 59(e)) (citations omitted).

10. The court notes that neither plaintiff nor defendants made any reference to any document in this exchange until the immediate motion for reargument. Although the request to reopen the appeal and the subsequent denial letter were included in the parties' exhibits in the cross-motions for summary judgment, it is not the duty of the court to pore over the almost 1,000 page administrative record in order to glean this information.

unavailability of further appeal, the August 7, 2009 denial letter also informed Morningred that Sedgwick CMS considered the initial claim denial "sufficient" in providing Morningred with enough information to request a review of the denial and that any inadequacy of the initial claim denial was "harmless error." [11]

In its original order, the court found that "[w]here ERISA requires claimants first address their complaints to a designated fiduciary to whom Congress, in Section 503, assigned the primary responsibility for evaluating claims for benefits, the court will not intervene." [12] As a result of Sedgwick CMS's response to Morningred's request to reopen the appeal, it appears that Morningred did address her complaint to the designated fiduciary and received both a procedural and substantive denial. Further, the Third Circuit has reasoned that exhaustion is generally required to (1) allow the appropriate agency to develop a factual record and apply its expertise to facilitate a judicial review; (2) permit agencies to grant the relief requested in order to conserve judicial resources; and (3) provide agencies the opportunity to correct their own errors in order to foster autonomy.[13] Here, Sedgwick CMS's August 7, 2009 letter evidences a developed record wherein the administrator was afforded the opportunity to correct any procedural defects and apply its expertise regarding the Plan. The court finds that the record demonstrates Morningred's exhaustion of her administrative remedies.[14] As

a result of this evidence, which neither party raised in the previous cross-motions for summary judgment, the court grants Morningred's motion for reargument and addresses the alleged procedural defects in Sedgwick CMS's initial denial letter.

### B. Sufficiency of Sedgwick CMS's Initial Denial Letter

The code of federal regulations requires that denial letters inform a claimant:

> [I]n a manner calculated to be understood by the claimant ... (i) [t]he specific reason or reasons for the adverse determination; (ii) [r]eference to the specific plan provisions on which the determination is based; (iii) [a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary[.] [15]

Sedgwick CMS's initial denial letter informed Morningred that a claim for disability under the Plan requires "objective evidence to substantiate the disability claim," and that "[b]ased on a clinical review of [her] claim, [there was] no objective medical documentation to support [the] diagnosis." [16] The letter advised Morningred that there appeared to be "no consistent treatment plan, other than physical therapy, appropriate for this diagnosis," and consequently denied her short-term disability claim beyond June 30, 2008.[17]

11. D.I. 48, Ex. 1 at 6.

12. *Morningred v. Delta Family–Care & Survivorship Plan*, 790 F.Supp.2d 177, 184 (D.Del. 2011).

13. *See Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 761–62 (3d Cir.1996).

14. As the letter also provides that "Ms. Morningred has exhausted her administrative

remedies available to her under the Plan," it would appear that the administrator would concur with this finding.

15. 29 C.F.R. § 2560.503–1(g)(1).

16. D.I. 31, Ex. C at SMM 00507.

17. *Id.*

The letter further instructed Morningred that if she wished to appeal the decision, to send a written request to the administrator including "the reason(s) you believe your claim was improperly denied [and] any additional comments, documents, records or other information relating to your claim that you deem appropriate for us to give your appeal consideration."[18] Sedgwick CMS then specified the type of medical information required, such as:

- A detailed narrative report for the entire period of absence outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;

- Diagnostic studies conducted during the above period, such as test results, X-rays, laboratory date, and clinical findings;

- Any information specific to the condition(s) for which you are claiming disability that would help us evaluate your disability status; and

- Any other information or documentation your think may help in reviewing your claim.[19]

Sedgwick CMS closed the denial letter by offering to provide Morningred with a copy of the documents, records, or other information relevant to her claim upon request and informed her of her right to an appeal under Section 502(a) of ERISA.[20]

▮ The administrator's initial denial letter clearly outlined the specific reasons for the adverse determination and provided Morningred with a description of the additional material necessary to perfect her claim. The letter, however, failed to reference the specific plan provisions on which the determination was based as required under 29 C.F.R. § 2560.503–1(g)(1)(iii).[21] Case law in the Third Circuit has found that a notice is sufficient if it is "in substantial compliance with the governing regulation."[22] A denial letter is substantially compliant with the regulations when the claimant is provided "a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review."[23] The specifications in the letter, combined with an extensive back and forth between the administrator and Morningred, evidences a clear recital of the administrator's position regarding Morningred's disability determination. Despite the missing references to the specific plan provisions

18. *Id.,* Ex. C at SMM 00508.

19. *Id.*

20. *Id.*

21. Plaintiff's original cross-motion for summary judgment alleged only that the administrator's initial denial letter violated the regulation due to a insufficient description of the material or information necessary for the claimant to perfect the claim and an insufficient explanation of why such material and information was necessary. The original motion did not contest the lack of a reference to the specific plan provision upon which the determination was based but, for the sake of

statutory compliance, the court addresses the consequences of this omission.

22. *Brown v. First Reliance Standard Life Ins. Co.,* 2011 WL 1044664, at *9 (W.D.Pa. Mar. 18, 2011) (citing *Mazur v. Hartford Life & Accident Co.,* Civ. No. 06–1045, 2007 WL 4233400 (W.D.Pa. Nov. 28, 2007)); *see also Kao v. Aetna Life Ins. Co.,* 647 F.Supp.2d 397, 411 (D.N.J.2009); *Russell v. Paul Revere Life Ins. Co.,* 148 F.Supp.2d 392, 410 (D.Del. 2001).

23. *Brogan v. Holland,* 105 F.3d 158, 165 (4th Cir.1997) (internal quotation marks and citations omitted), *abrogated on other grounds.*

that led to the denial of benefits, Sedgwick CMS provided Morningred with a clear reason for the denial and the specific steps necessary to perfect her claim. Nothing more was required.

### C. The Court's Reliance Upon Defendant's Legally Erroneous Arguments

In the memorandum order, the court noted Morningred's argument that the submitted medical evidence demonstrates a number of diagnoses outlining the very medical criteria requested by the initial denial letter. In rebuttal, defendants countered that although some medical evidence supported a finding of CRPS, there existed conflicting medical opinions regarding the causes of Morningred's disability and her ability to return to work. When presented with conflicting medical opinions, Sedgwick CMS argued, the Plan granted the administrator complete discretion to weight the conflicting evidence and render a decision. In listing this conflicting medical evidence, the court remarked that although one of the examiners, Dr. Robert Veripapa, found "some discoloration" in Morningred's ankle, that other examinations were "negative."[24] Morningred argues that the medical literature provides that the "most important role for testing is to help rule out other conditions,"[25] and that a "negative" test supports a finding of CRPS. Defendants statements, argues Morningred, led the court to weigh the absence of objective testing as evidence of the non-existence of plaintiff's CRPS and any causal disability. In contrast to her argument, however, the court did not weigh the medical evidence and find that the evidence weighed against the existence of Morningred's CRPS. The court made note of Dr. Marks' contrary medical opinion and found Sedgwick CMS's decision to credit the opinions of certain medical evidence over other contrary medical evidence was proper under the law.[26] Whether Dr. Veripapa's opinion supported a finding of Morningred's disability or opposed such a finding would not have affected the court's finding that Sedgwick CMS was granted complete discretion to weigh conflicting medical evidence and then render a decision.

Morningred next asserts that the defendants characterized Dr. Howard I. Levin as the "plaintiff's physician" when, in fact, Dr. Levin was retained by defendants in connection with Morningred's workers' compensation proceeding. Morningred argues Dr. Levin's position, that she was unable to return to her previous position but should have been able to work in a sedentary position, conflicts with that of Dr. Marks, who was also retained by Sedgwick CMS. This conflict of opinion by two medical experts hired by Sedgwick CMS, Morningred argues, renders any evidence proffered by defendants unreliable. Morningred offers no authority for this conclusion and the evidence demonstrates that Morningred herself submitted Dr. Levin's report to the administrator for review. As a result, the court cannot find any basis to grant Morningred relief for this claim.

Finally, Morningred argues that the Supreme Court, in *Black & Decker Disability Plan v. Nord*, stated that a plan administrator may only credit "reliable evidence"

---

**24.** *Morningred v. Delta Family–Care & Survivorship Plan,* 790 F.Supp.2d at 185.

**25.** *Complex Regional Pain Syndrome Fact Sheet* (Feb. 18, 2011), http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/ detail_reflex_sympathetic_dystrophy. htm# 174993282.

**26.** *See Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831–34, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003).

that conflicts with a treating physician's evaluation. Dr. Bruce Grossinger, Morningred's treating physician, found that she suffered from reflex sympathetic dystrophy of the left lower extremity and could not return to her work as a baggage service agent where she was required to lift and carry bags and suitcases up to 100 lbs. According to Morningred, Dr. Marks' contrary conclusion, that she could return to her customary occupation after a six to eight week convalescence period, was not reliable because Dr. Marks mischaracterized her customary occupation as only "collecting and tagging leftover bags." Morningred explains that this conclusion ignored her actual job description which required her to lift a total of over ten tons each day and cannot be viewed as "reliable evidence." In his opinion, Dr. Marks stated that Morningred "had been working for Delta Air Lines where her duties included managing passenger baggage. Apparently, for security purposes, this also entailed collecting and tagging left-over bags (generally weighing 30 to 40 pounds but sometimes as heavy as 70 pounds.)"[27] In summarizing a conversation with Dr. Michael Kelman, Dr. Marks also noted that Morningred "worked as a ticket agent, but was required to lift passengers' luggage and bags."[28] This language, in addition to the observation that Morningred was required to collect bags weighing from 30–70 lbs, demonstrates that Dr. Marks did not ignore plaintiff's job description. Consequently, the court cannot find that Dr. Marks' decision is unreliable evidence, proscribed by *Nord.*

III. Conclusion

Due to the incongruity between the administrator's decision and Dr. Marks' medical opinion, upon which the administrator ultimately relied, the court remanded Sedgwick CMS's decision for a judgment regarding the plaintiff's disability between July 1, 2008 and July 23, 2008. The opinion did not address any other reason for remand as noted herein.

The court grants plaintiff's motion to reargue Morningred's claim of procedural defects in Sedgwick CMS's initial letter due to evidence in the administrative record which the parties failed to reference in the initial cross-motions for summary judgment. However, after consideration of the substantive claim, the court finds that the initial denial letter substantially complied with the requirements outlined in the regulations and finds no error in the administrator's initial denial. The court denies the remainder of Morningred's motion for reargument and finds that the administrator based its decision upon reliable evidence. Therefore,

IT IS ORDERED, ADJUDGED and DECREED consistent with the findings herein that: defendants Delta Family–Care & Survivorship Plan and Sedgwick Claim Management Services' motion for clarification (D.I. 47) is **GRANTED** in-part insofar as the court clarified its earlier order and the reasoning behind the decision to remand Sedgwick CMS's decision to the administrator and **DENIED** in-part with regards to defendants' request to limit the scope of remand. Plaintiff Sharon Morningred's motion for reargument (D.I. 48) is **GRANTED** in-part as noted herein and **DENIED** as to the request for further briefing and to remand the entire factual record to the administrator for reconsideration. On consideration of the arguments raised in reargument and on the original cross-motion for summary judgment, the court finds that the denial letter substan-

27. D.I. 31, Ex. C at SMM 00037.

28. *Id.* at SMM 0035–36.

tially complied with the requirements of ERISA and plaintiff's motion is **DENIED** in that regard.